GREENWOOD UTILITIES COMMIS-
SION, Plaintiff-Appellant,

v.

MISSISSIPPI POWER COMPANY,
Defendant-Appellee.

GREENWOOD UTILITIES COMMIS-
SION, Plaintiff-Appellee,

v.

MISSISSIPPI POWER COMPANY,
Defendant-Appellant.

Nos. 83–4786, 84–4009.

United States Court of Appeals,
Fifth Circuit.

Feb. 7, 1985.

Rehearing and Rehearing En Banc
Denied March 7, 1985.

Wheatley & Wollesen, Charles F. Wheatley, Jr., Don Charles Uthus, Washington, D.C., Whittington, Brock, Swayze, Dale & Calhoun, H. Donald Brock, Charles Swayze, Jr., Greenwood, Miss., for plaintiff-appellant in No. 83–4786.

Eaton, Cottrell, Galloway & Lang, Ben H. Stone, H. Rodger Wilder, Gulfport, Miss., Troutman, Sanders, Lockerman & Ashmore, Robert H. Forry, Robert P. Edwards, Jr., Atlanta, Ga., for defendant-appellee in No. 83–4786.

Ben H. Stone, H. Rodger Wilder, Gulfport, Miss., Troutman, Sanders, Lockerman & Ashmore, Robert H. Forry, Robert P. Edwards, Jr., Atlanta, Ga., for defendant-appellant in No. 84–4009.

Charles F. Wheatley, Jr., Washington, D.C., H.D. Brock, Whittington, Brock, Swayze, Dale & Calhoun, Charles J. Swayze, Jr., Greenwood, Miss., for plaintiff-appellee in No. 84–4009.

Before GEE, POLITZ, and HIGGINBOTHAM, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

The Greenwood Utilities Commission, of Laflore County, Mississippi, appeals from a summary judgment in its antitrust suit against Mississippi Power Company. Armed with the Sherman Act, Greenwood attacks the refusal to allocate electric power to it by the Southeastern Power Administration, a division of the Department of Energy. The power refused would have been transmitted over power lines owned by Mississippi Power and its sister companies. Greenwood asserts that SEPA's decision was a product of monopoly power held by Mississippi Power and its affiliates over the transmission of electricity from SEPA, and alleges that acts by these entities violated both Sections 1 and 2 of the Sherman Act. Putting aside acts protected by the First Amendment, we conclude that SEPA's decision not to allocate power to Greenwood and the SEPA-Mississippi Power contract incorporating that decision did not violate the antitrust laws. We affirm a magistrate's grant of summary judgment in favor of Mississippi Power.

## I

### –1–

Greenwood is an agency of the City of Greenwood, Mississippi and supplies electricity to customers in that area. Until an interconnection agreement with Mississippi Power and Light Company in 1977, Greenwood generated its own electricity from two generating plants, and its transmission lines were not connected to the lines of any other utility. After the connection, its power was supplemented by bulk power

purchased from Mississippi Power and Light and others and transmitted to Greenwood over the transmission lines of Mississippi Power and Light.

Mississippi Power Company is a Mississippi corporation, qualified under the Public Utility Act of Mississippi, and provides service to more than 135,000 residential, 23,500 commercial and 350 industrial customers in twenty-three northeast Mississippi counties. Its transmission lines are connected to the lines of four electric cooperatives to which it sells energy, but it owns no transmission lines in Laflore County, Mississippi and is not directly connected to Greenwood. However, by virtue of its interconnections with Mississippi Power and Light, Mississippi Power Company is indirectly connected to Greenwood.

Mississippi Power is also interconnected with its sister companies in the Southern group, the Alabama, Georgia and Gulf Power companies. All are wholly-owned subsidiaries of the Southern Company and together form the Southern Company electrical system. Another subsidiary of the Southern Company, Southern Company Services, Inc., acts as a central dispatcher of power and coordinates its allocation to provide to the operating companies on a continuous basis the power requirements of their respective service areas. By this pooling of power the Southern companies achieve economies of scale, optimum utilization of generation capacity and coordinated control, thus allowing each sister company to provide electric service at a cost lower than would be possible without the sharing.

The Southeastern Power Administration, SEPA, is a division of the Department of Energy, formerly under the Department of the Interior, with home offices in Elberton, Georgia. Congress charged SEPA in the Flood Control Act to market surplus hydroelectric power generated by federal dams constructed in the southeastern part of the United States.[1] *See* 16 U.S.C. § 825s. Under the Flood Control Act, SEPA must market surplus power from the hydro-electric projects in its territory "in such a manner as to encourage its most widespread use at the lowest possible rates to consumers consistent with sound business principles ... [but giving preference] to certain public bodies and cooperatives." *Id.* These public bodies and cooperatives are known as "preference customers." SEPA owns no electric transmission lines, however, and depends upon utilities situated near the power sources for the transmission of electric power to its customers.

–2–

In 1975 and 1976 new generating units at the West Point, Jones Bluff and Carters dams of the Alabama-Georgia system were completed. Before their addition, SEPA marketed power from its Alabama-Georgia system to the customers preferred under the Flood Control Act by transmission over the Alabama and Georgia companies' power lines. The wheeling contracts with those companies limited SEPA's rights to sell to preference customers to those located within the service areas of Georgia and Alabama Power. With the anticipated power from the three new dams, SEPA decided sometime in 1974 or 1975 to expand its Alabama-Georgia system sales to serve additional preference customers in southeast Mississippi and the panhandle of Florida. The proposed additional customers were to be those electrically connected to the Mississippi Power and Gulf Power electric systems, the idea being that Mississippi Power and Gulf Power respectively would wheel power to the preference customers for SEPA. Mississippi Power was initially hostile to SEPA's delivery of this power, but after extensive lobbying by SEPA and negotiations which we will discuss more fully *infra*, Mississippi Power Company contracted to wheel the power for SEPA.

It is this SEPA-Mississippi Power contract, executed August 1, 1976, that provides the immediate focus of our attention here. The specific provision in the contract

---

**1.** SEPA administers the Alabama-Georgia, Kerr-Philpott, Cumberland Basin, Jim Woodruff and Laurel systems.

which Greenwood challenges is Paragraph 4.1, which effectively reserves for Mississippi Power and preference customers within its territory all of the available power. Identical provisions were included in the contracts SEPA had previously executed with the Georgia and Alabama Power companies. The clause provides:

> To be served as a preference customer of the Government under this contract, the customer shall be any of the following whose requirements or a portion thereof the Government shall have contracted to supply by delivery from Mississippi Power's system pursuant to this contract: A municipality *located within Mississippi Power's service area,* owning its own transmission or distribution system, and desiring to purchase capacity and energy from the Government for resale to the public in its territory, or an electric distribution or generation and transmission and cooperative operating under Chapter 184 of the Laws of Mississippi of 1936, as amended, *located within Mississippi Power's service area* desiring to purchase capacity and energy from the Government for resale under the provisions of said Act. (Emphasis supplied.)

Although Greenwood as a public agency qualifies as a "preference customer" under the Flood Control Act, the effect of the contract clause is that SEPA sells Greenwood no power, since it is located outside of Mississippi Power's service area.

The government's decision not to sell power to Greenwood, however, preceded the execution of the SEPA-Mississippi Power contract. On November 19, 1975, Charles Matthews, manager of Greenwood Utilities, wrote to SEPA's administrator reminding him that he had promised to notify Greenwood of the availability of additional federal power, pointing to the additions to the Georgia-Alabama system in 1975 of the West Point, Jones Bluff and Carters projects. He also wrote Jack Carlson, then Assistant Secretary of the Interior, requesting assistance in obtaining SEPA power. On January 20, 1976, some six months before the execution of the SEPA-Mississippi Power contract, Raymond Peck of SEPA responded to Greenwood's November inquiry explaining that SEPA did not plan to so extend its market area.

After the initial rejection of Greenwood's 1975 request and after the 1976 contract was executed, the government persisted in its refusal to allocate power to Greenwood. Greenwood then filed this suit against Mississippi Power alleging that SEPA's decision not to sell it power was the product of conspiracy and of a monopoly enjoyed by Mississippi Power and its affiliates over transmission and generating facilities needed by SEPA, and that Mississippi Power had used this leverage to keep the new power within the Southern system.[2] To put these allegations in context, we must first explain some of the technical and eco-

---

**2.** Greenwood's complaint charged that Mississippi Power Company conspired with other members of the Southern Company system and with SEPA and the Department of Interior to impose unreasonable restraints of trade in commerce at all levels of production, transmission and distribution of electric power in Mississippi. The complaint further charged that Mississippi Power individually monopolized and conspired to monopolize trade in the transmission, distribution and sale of electric power at wholesale and retail in Mississippi.

Specifically, the complaint alleged that pursuant to the conspiracy five things were done: (1) By the August 1, 1976 contract, Mississippi Power Company "established a restrictive division of markets for federal power generated, transmitted, and sold by SEPA and the Department of Interior under authority of Section 5 of the Flood Control Act." (2) All energy generated by SEPA and sold in Mississippi was sold to Mississippi Power Company, which had agreed not to resell any of the power outside its territory and to resell only to preference agencies inside that territory. (3) This "arrangement" barred competition for acquisition of federal power by entities outside Mississippi Power's territory. (4) Benefits of "peaking power and capacity power" from federal projects were restricted to the exclusive use of Mississippi Power Company which restricted the wheeling of power to electric systems within its service territory or those of its sister companies. (5) Greenwood was barred from obtaining power from competitors who could deliver only by use of the Southern companies' transmission facilities and was thus denied the benefit of the economy energy interchange operations and other benefits of pooling. The complaint sought both injunctive and monetary relief.

nomic considerations involved in the marketing of federal hydropower as well as the history of SEPA's relationship with Mississippi Power and its affiliates.

–3–

While hydroelectric power enjoys technical advantages over fossil fuels or other energy sources, if a hydrosystem operates alone, its limited water supply requires continuous release to the turbines and thereby reduces its ability to meet energy demands at peak periods. To generate its maximum output during peak periods, a hydrosystem must be able to store water and avoid releases during off-peak periods. Coordination of hydro and thermal generation is one way of doing this. Such coordination increases the dependable capacity of hydro projects and the efficiency of related thermal plants. Whitfield Russell, a registered engineer and expert for Greenwood in this suit, explained the process by which hydroelectric power is supplemented or "firmed" with thermal power as follows:

> In hydro/thermal coordination, thermal energy is diverted during off-peak periods to the loads which would otherwise have to be served by the hydro resource. The off-peak output of the hydro resource is reduced commensurately. In a contractual sense, the off-peak energy is deemed "stored" or "banked" by the hydro system for withdrawal later. [In a physical sense the hydro system stores energy by deferring off-peak water releases which the hydro system would have to make if it did not receive energy from the thermal system.] During on-peak periods, the hydro resource produces energy at a rate sufficient to serve the demands of its own customers and also to return the energy deemed "stored" for that entity which provided the off peak energy.

By marketing its power through affiliates of the Southern Company, entities which can provide SEPA with thermal resources as well as transmission lines, SEPA is thus able to enhance dependable capacity of its hydro resources.

By marketing its power through the Southern companies, SEPA also is able to avoid certain problems in billing its customers. The coordination between SEPA and Mississippi Power and its affiliates is effected by a series of contracts between those companies and SEPA which together comprise an "integration arrangement." Absent such an arrangement, SEPA would need control systems designed to match, on a second-to-second basis, the output of its resources with that portion of the preference customer's loads for which SEPA is assigned responsibility. Under the integration arrangement, according to Russell, government control systems and transmission networks are unnecessary:

> SEPA's resources are effectively turned over to Southern to use as Southern sees fit ..., and SEPA's preference customers are deemed by agreement to receive specified portions of their total requirements at low cost from SEPA instead of at high cost from the Southern System's operating companies irrespective of whether SEPA power deemed delivered to preference customers at any given time matches the power produced by SEPA hydroelectric plants.

SEPA is not the only beneficiary in this coordinated arrangement, however. Although the Southern companies provide all off-peak energy to the SEPA hydrosystem, they receive a number of advantages, including assured capacity of energy on-peak which in turn enables them to avoid construction and daily commitment of extra thermal units. In short, by controlling the hydropower generated by the Georgia-Alabama system, the Southern companies effectively provide energy for serving a portion of their own peak demands at off-peak energy costs. Thus, although the Southern system must forego sales to preference customers in the amount of their preference entitlements, and therefore lose a portion of their power market to SEPA by agreeing to wheel power, the availability of on-peak SEPA capacity probably results in a net benefit to the Southern companies.

–4–

The history of SEPA's relationship with Mississippi Power and its affiliates begins in the early 1950's, when SEPA first began marketing federal hydropower. In 1950 the Southern companies proposed that SEPA allocate all federal power to Southern Company service areas for resale to preference customers by the system's operating companies, but SEPA apparently deemed such an arrangement to be inconsistent with its statutory obligation under Section 5 of the Flood Control Act to give preference to public bodies and cooperatives. SEPA then requested that Congress appropriate money for SEPA to build its own transmission lines and thermal power firming facilities. The Southern companies opposed such appropriations and argued to SEPA and to Congress that marketing federal hydropower through private utilities such as the Southern companies would eliminate the need for such appropriations, result in cheaper firming and transmission costs, and create minimal interference with the existing commercial relationships between preference customers and their suppliers. Congress refused to fund transmission facilities for SEPA and thus implicitly accepted the companies' interpretation of SEPA's obligations under Section 5. Denied appropriations by Congress and following extensive negotiations with the Southern companies, SEPA ultimately agreed to wheel its power through the Southern system and to adopt the hydro/thermal coordination arrangements we have described.[3]

Contracts for wheeling power were executed between SEPA and Georgia Power in 1956, then later with Alabama Power as SEPA's generating capacity increased, and the meld of SEPA and the Southern system grew. A SEPA marketing study prepared for the West Point, Jones Bluff and Carters dams demonstrates the symbiotic relationship inherent in the marketing system. The study concluded:

> For maximum efficiency, the three new projects will be integrated with each other and with the existing projects in the Federal Georgia-Alabama System through the transmission facilities of the Georgia and Alabama Power Companies. Additionally, at Carters, pumping energy in amounts yet to be determined will be required to make the capacity fully useable. The only practical resources of this energy are the coal-fired steam plants of Georgia Power Company or the other operating companies of the Southern Company. Since these companies must provide such essential transmission and support services, they necessarily are vitally important to a proper resolution of all aspects of Southeastern's marketing plan, including a determination of marketing area.

The negotiations between SEPA, Mississippi Power and the other Southern companies that culminated in the August 1, 1976 contract between SEPA and Mississippi Power commenced in 1974. The early meetings involved SEPA and several Southern Company affiliates, but not Mississippi Power or Gulf Power. In the early stages of the discussions SEPA proposed either to send the new power into the remainder of the Southern Company territory—the service areas of Mississippi and Gulf Power companies—or to allocate it to other preference entities in Florida. When both Mississippi Power and Gulf Power initially resisted the idea of selling federal preference power out of concern that too many of their present customers would look to SEPA for power, and when transmission problems made sales to the proposed Florida customers infeasible, SEPA considered simply selling all the new power through the Georgia and Alabama Power companies. SEPA also suggested that if an acceptable arrangement could not be

---

3. For a more detailed treatment of the policy debate over SEPA's options for marketing federal hydropower, see, for example, *Interior Department Appropriations for 1953: Hearings on H.R. 7176 Before a Subcommittee of the Senate* *Comm. on Appropriations,* 82d Cong., 2d *Sess.* 1169 (1952) (statement of Harllee Branch, Jr., President of Georgia Power Company); *id.* at 1215 (statement of L.P. Sweat, President of Mississippi Power Company).

worked out for marketing the power within the Southern system, it might choose to bypass the companies entirely. Ultimately the officers of Mississippi and Gulf Power agreed to wheel for SEPA, and Mississippi Power executed the August 1, 1976 contract.

## II

After substantial discovery and a stipulation that the case would be tried to a magistrate without a jury, Mississippi Power moved for summary judgment. Mississippi Power's motion raised two central arguments. First, it argued that Mississippi Power Company had not caused and did not threaten any antitrust injury to Greenwood because it was SEPA's decision not to transmit hydroelectric power from the new Georgia-Alabama projects to Greenwood.[4] Alternatively, Mississippi Power argued in support of its motion that its "cooperation" with the government marketing program did not violate the antitrust laws because such cooperation was not anticompetitive.[5]

Greenwood replied that Mississippi Power's motion rested on disputed questions of fact which precluded summary judgment. Greenwood explained that it did not simply challenge SEPA's refusal to allocate power to it but also complained of the coercive influences of Mississippi Power and its affiliates which caused the government to make that marketing decision. Thus, Greenwood argued, summary judgment was inappropriate. Both parties supported their motions with affidavits that described the economic and technical considerations surrounding SEPA's decisions on the allocation of the federal hydroelectric power at issue.

–1–

Mississippi Power filed the affidavit of Harry F. Wright, administrator of SEPA. Wright described the history of SEPA, its relationship with the Southern companies, and the negotiations that culminated in Mississippi Power's contract with SEPA. He explained that SEPA determined that its program and statutory obligations could be best implemented by sales to preference customers made using the transmission services of Mississippi Power Company and Gulf Power, in addition to its preexisting arrangements for sales to preference customers using the services of Alabama Power and Georgia Power. According to Wright, SEPA considered Greenwood's request for SEPA power before contracting with Mississippi Power Company and the decision not to sell Greenwood power was made "without consultation with Mississippi Power Company or its affiliates." He denied that SEPA ever agreed with any of the Southern companies not to furnish power to Greenwood.

Wright further explained that when SEPA rejected Greenwood's request for power it had never dealt with Mississippi Power and Light Company (whose transmission lines link Mississippi Power Company to Greenwood) and had never sold any power to any entity in Mississippi Power

4. Specifically, Mississippi Power Company contended that it was never requested by SEPA to provide any service to Greenwood because Greenwood was outside the area in which the government chose to market its power. Mississippi Power pointed out that this decision not to market any of the Georgia-Alabama hydroelectric power to Greenwood was reconfirmed in 1977, *after* SEPA had contracted with Mississippi Power, by the Department of the Interior and the Department of Energy in a public rulemaking which established the government's marketing policy. Mississippi further pointed out that by this marketing policy, *Georgia-Alabama System of Projects*, 45 Fed.Reg. 65140 (October 1, 1980), the Department of Energy proposed in 1980 to sell power originating in Tennessee and Kentucky in the Cumberland System to Greenwood—power over which Mississippi Power had

no control. This was the first power offered by the government to Greenwood.

5. Mississippi Power asserted that its cooperation with SEPA had benefitted the public and consumers in the following ways: it increased the number of bulk power suppliers operating in Mississippi by providing SEPA access to them across its lines; it provided a relatively low cost source of power for Mississippi Power's principal retail competitors and provided a relatively low cost source of power for the Southern Mississippi Electric Power Association, assertedly a competitor of Mississippi Power Company; finally, Mississippi Power's cooperation had displaced wholesale sales in Mississippi it could otherwise have made itself.

and Light's service territory. He swore that SEPA never requested Mississippi Power or its affiliates to deliver the power to Greenwood and that no arrangements were made in the SEPA-Mississippi Power contract to facilitate sales to Greenwood because a decision had already been made not to supply it. He then explained that his decision had been reviewed internally by the Department of the Interior, and that Congress had approved appropriations for SEPA after review of its decision without directing SEPA to change its program. Finally, Wright noted that under the marketing program, for which notice was given in the Federal Register on August 19, 1981, the Cumberland System of projects in Tennessee and Kentucky would allocate power to Greenwood.

Mississippi Power also supported its motion for summary judgment with the affidavit of Harry H. Bell, a vice president of Mississippi Power Company. Bell admitted that Mississippi Power had initially been reluctant to deal with the government since SEPA's power would reduce Mississippi Power's own wholesale sales to the preference customers. However, he stated that "on advice of counsel and after much deliberations and negotiations, Mississippi Power agreed to the arrangement SEPA proposed and entered a contract dated August 1, 1976." Bell swore that "Mississippi Power Company has never attempted to restrict or limit the marketing of SEPA power" and denied that Mississippi Power Company knew that Greenwood was seeking the power that SEPA marketed through the August 1, 1976 contract. Mississippi Power Company only learned that Greenwood wanted SEPA power, he explained, after Greenwood sued SEPA and sought leave to add Mississippi Power as a defendant. He also denied that Mississippi Power was in a position to prevent the delivery of government power to Greenwood, because Greenwood was connected to other power transmission systems through which government power could be transmitted.

–2–

Greenwood, in turn, filed the affidavits of Basil L. Copeland, Jr. and Whitfield A. Russell and various attached exhibits. Copeland was an economist and senior consultant retained by the City of Greenwood. He testified that his opinions were based upon personal analysis and review of documents that described the negotiations that culminated in the August 1, 1976 contract "along with relevant antecedent materials, and the opinion and testimony of other expert witnesses in this action."

He swore in conclusory terms that "Mississippi Power Company in combination with the other operating companies of the Southern Company conspired to restrict to the Southern Company service territory, and thus monopolize, the distribution of preference power available from what is known as the Georgia-Alabama system projects." He described the relationship between SEPA and the Southern companies as "one of bilateral monopoly," with SEPA effectively owning the generation resources known as the Georgia-Alabama System and the Southern Company holding monopoly power over the transmission of power to preference customers from projects west of the Savannah River. He also swore that "... prior transactions between SEPA and operating companies of the Southern Company ... prevented SEPA from acting independent of the Southern Company in deciding how to market power from the West Point, Jones Bluff and Carters projects of the Georgia-Alabama System. As a result, Greenwood was denied an allocation of preference power from these projects, and was competitively injured as a consequence."

Copeland opined that the transactions and negotiations leading to the 1976 contract exhibited characteristics of "impacted information, opportunistic behavior, first-mover advantages and a small numbers bargaining situation," and that "the decision to restrict the availability of preference power from these projects to preference customers within the service territory of the Southern Company was based upon institutional considerations arising out of the bilateral monopoly relationship ...." He pointed to a memorandum of Jan For-

tune, the administrator of SEPA, dated May 26, 1976 which stated that "there are no insurmountable technical, legal, or economic problems in sending power to Greenwood ... but that is not the proper context of the problem. The question is whether we go outside the Southern System to areas to the west, south, east and north." Because the Southern System had the advantage of a superior negotiating position, he explained, it was able "to effectively dictate the terms of trade to its ultimate advantage."

Copeland identified a study prepared by SEPA in February 1975, "Marketing Power, West Point-Jones Bluff-Carters Projects, Federal Georgia-Alabama System," as containing the real reasons for restricting the output of the projects to the service territory of the Southern System. He noted that the study had observed that "since the companies must provide such essential transmission and support services, they necessarily are vitally important to proper resolution of all aspects of Southeastern's marketing plan including a determination of the marketing area." He concluded that SEPA was "locked into the relationship" given the Southern companies' control over transmission and because the companies were required to provide essential support services such as pumping capacity. These support services were made essential by prior decisions "to fit the projects on the projected load curve of the Southern System service territory," according to Copeland, and "any attempt to restructure the marketing of these projects so as to bypass the Southern System would have been so costly as to be prohibitive."

It followed, according to Copeland, that "SEPA had no realistic alternative but to deal with the Southern Company, and to accept terms of trade largely dictated by the Southern Company." He pointed to (i) internal memoranda of the Southern companies which demonstrated that the companies "have a definite need for the power;" and (ii) the initial resistance of Gulf and Mississippi Power to the plan to include their service territories in SEPA's proposed marketing of 1975; (iii) the absence of tech-

nical legal or economic problems in sending power to Greenwood; and (iv) the fact that Greenwood "was the only applicant for power from these projects whose application was denied." In sum, he concluded that the Southern companies wanted and needed the new SEPA power and that given their control over necessary operation and transmission resources, SEPA had to agree to market the new power in Southern Company territory, that is, the service area of Mississippi Power.

Whitfield A. Russell, a registered professional engineer, was a member of a public utilities consulting firm retained by Greenwood. His affidavit testimony was based upon his "education, experience and ... study of the contracts and history related to the Southeastern Power Administration's marketing of power from the Georgia-Alabama system of projects." Russell explained, as Bell had in his affidavit, some of the technical and economic considerations pertinent to SEPA's marketing decisions and detailed the history of SEPA's relationship with the Southern companies. He then testified in conclusory terms that "SEPA was forced to deny Greenwood an allocation because Mississippi Power together with the other operating companies of the Southern Company, used their exclusive control of transmission facilities between SEPA projects and its preference customers to limit marketing from the western portion of SEPA's unique and valuable Georgia-Alabama System to the service areas of the Southern operating companies."

Russell testified, "Southern has so arranged its physical control of the operation of SEPA's projects that SEPA could not, without permission and active participation by Southern, deliver power to Greenwood." Given this control, he opined that since there were no technical or economic reasons for SEPA to deny a power allocation to Greenwood, and since the negotiations proved that the affiliates of the Southern Company wanted and needed the new power, "SEPA's action [could] only be reconciled with a recognition by SEPA that it

had no ability to market power outside Southern's area against Southern's wishes."

–3–

The magistrate granted summary judgment in favor of Mississippi Power on two alternative grounds. First, he concluded that Greenwood had not stated a claim because it was merely challenging a government program. He relied on the Eleventh Circuit's decision in *Medical Association of Alabama v. Heckler*, 714 F.2d 107 (11th Cir.1983), that private individuals and federal officials could not be sued under the Sherman Act for setting up a community health program that hurt the trade of Alabama physicians. Alternatively, he ruled that even if Greenwood's allegations were true, it could not have been injured *by reason of* the challenged activity absent a showing that SEPA would have ever sold power to it anyway. Greenwood had presented no such evidence, according to the magistrate; thus the jurisdictional requirements of Clayton Act Section 4, 15 U.S.C. § 15, had not been met.

### III

–1–

Before addressing the validity of Greenwood's theories of liability and the correctness of the magistrate's rejection of those theories, we put to rest certain questions about the evidentiary record underlying his decision on summary judgment. Mississippi Power argues forcefully on appeal that even if we agree that Greenwood has presented theories that might support liability, we must reject its challenge to the summary judgment because Greenwood failed to raise genuine issues of fact for trial. Mississippi Power contends that the affidavits of Copeland and Russell, the principal evidentiary support for Greenwood's opposition to the summary judgment, are insufficient to controvert Mississippi Power's defense of SEPA's decision.

Greenwood's affidavits are assertedly deficient because they are based on inadmissible hearsay rather than personal knowledge and fail to meet the saving exception of Fed.R.Evid. 703 which permits hearsay to provide the basis for an expert's opinion if shown to be evidence "of a type reasonably relied upon by experts in the [witness'] particular field in forming opinions or inferences upon the subject." Mississippi Power also complains that both Copeland's and Russell's affidavits offered impermissible legal conclusions that are not protected by Fed.R.Evid. 704.[6] It raised these objections below, but the magistrate failed to resolve the issue before granting Mississippi Power's motion for summary judgment.

■ Mississippi Power is correct that when an expert's opinion is based on facts not admissible in evidence the court should make a threshold factual inquiry to determine whether the data providing the basis for the opinion is of a type reasonably relied on by experts in that field to form such opinions. *Barrel of Fun, Inc. v. State Farm Fire & Casualty Co.*, 739 F.2d 1028, 1033 (5th Cir.1984). In making this inquiry the court may inquire into the relevance of the data relied on as well as its reliability, *see, e.g., Soden v. Freightliner Corp.*, 714 F.2d 498, 502–07 (5th Cir.1983), but deference ought to be accorded to the expert's view that experts in his field reasonably rely on such sources of information. *In re Japanese Electronic Products*, 723 F.2d 238, 277 (3d Cir.1983). *See also* S. Saltzburg & K. Redden, *Federal Rules of Evidence Manual* 467 (1982).

■ In this case Copeland and Russell each stated in his affidavit that in forming his opinion he had analyzed documents describing the historical events that preceded the SEPA-Mississippi Power contract of August 1, 1976. Many of these documents may constitute inadmissible hearsay, yet neither expert testified that experts in his field reasonably rely on such evidence in

---

**6.** Rule 704 provides:
Testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact.

forming similar opinions, and there is no indication that the magistrate undertook any such factual inquiry. Although we are confident that such deficiencies in the affidavits are readily curable, were our decision dependent upon the presence or absence of such expert testimony in the record, we would remand the case for the requisite factual determination. As we discuss *infra,* however, even if this expert testimony is properly part of the summary judgment evidence, Greenwood has failed to present issues of fact that might support antitrust liability. Therefore we think it best to consider the testimony proferred by Copeland and Russell in evaluating Greenwood's antitrust claim.[7]

–2–

■ Although we affirm the magistrate's decision to grant summary judgment in favor of Mississippi Power, we do not wholly adopt his reasons for doing so. First, we think his reliance on *Medical Association of Alabama v. Heckler,* 714 F.2d 107 (11th Cir.1983), is misplaced because Greenwood made clear in its complaint that it was challenging not only SEPA's decision and its contract with Mississippi Power but also the actions of Mississippi Power Company and its affiliates that allegedly coerced SEPA into making that decision. There was no such alleged coercive activity in *Medical Association of Alabama.* We also think that the facts, viewed most favorably to Greenwood as they must be on a motion for summary judgment, support a conclusion that it was injured "by reason of" the challenged activities. Given Greenwood's status as a preference customer under 16 U.S.C. § 825s, the fact that SEPA power was being sold to non-preference customers, and the relationship between SEPA and the Southern

companies described in the affidavits of Copeland and Russell, a trier of fact could conclude that Greenwood would have been allocated power "but for" the actions of Mississippi Power and its affiliates.

–3–

Greenwood offers several theories of antitrust liability in support of its claims against Mississippi Power. It argues that Mississippi Power and its affiliates in the Southern Company conspired to effect and participated in a group boycott and concerted refusal to deal designed to prevent Greenwood from receiving federal power, and that the arrangements those companies made with SEPA, along with the Mississippi Power-SEPA contract, effected a horizontal division of the market for federal power from the western portion of the Georgia-Alabama system. In addition to these Section 1 violations, Greenwood argues that Mississippi Power and its affiliates monopolized in violation of Section 2 by using control over necessary transmission lines to institute a marketing policy that effectively foreclosed Greenwood from obtaining federal power.

■ We note at the outset that we must disregard Greenwood's claims under Section 1 of the Sherman Act insofar as they turn on Mississippi Power's alleged conspiracy with its affiliates in the Southern Company. Under the Court's decision in *Copperweld Corp. v. Independence Tube Corp.,* —— U.S. ——, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984), and our own decision in *Century Oil Tool, Inc. v. Production Specialties, Inc.,* 737 F.2d 1316 (5th Cir.1984), Mississippi Power and its sister companies must be viewed as one economic enterprise.[8] We therefore disregard the allega-

---

7. Our decision on this point makes it equally unnecessary for us to address Mississippi Power's complaint that affidavits of Copeland and Russell contained inadmissible legal conclusions outside the scope of Fed.R.Evid. 704.

8. The Court in *Copperweld* held that a corporation and its wholly-owned subsidiaries must be considered as a single economic unit for purposes of Section 1 conspiracy claims. Given the

unity of interest shared by a parent corporation and its wholly-owned subsidiary, their common objectives and common corporate consciousness, the Court reasoned that a combination of such entities was not a concentration of separate economic forces violative of Section 1. Relying on *Copperweld,* we held in *Century Oil* that two corporations under the common control and ownership of three individuals could not

tions that Mississippi Power violated Section 1 by conspiracy or agreements with its parent, the Southern Company, and its sister companies, Alabama, Georgia and Gulf Power.

We are then left with Greenwood's allegations that Mississippi Power unlawfully conspired with SEPA and used a monopoly over transmission lines and similar monopolies enjoyed by its sister companies to cause SEPA to deny Greenwood federal power and that the restrictive marketing provision in the August 1, 1976 contract constitutes an unreasonable restraint of trade. Greenwood argues that the Supreme Court's decision in *Otter Tail Power Co. v. United States*, 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973), supports liability.

In *Otter Tail* the Court held that a utility that supplied retail power to numerous midwestern towns had violated both Sections 1 and 2 of the Sherman Act by pursuing practices intended to keep the towns from adopting their own municipal utility systems. These practices included a refusal to wheel power that the federal government wished to sell to the towns and the inclusion in Otter Tail's contracts with the government provisions that prevented it from selling power to certain potential competitors of Otter Tail. The Court condemned the refusal to wheel power as monopolization, 410 U.S. at 377, 93 S.Ct. at 1029, and the restrictive contract provisions as a territorial market division. *Id.* at 378, 93 S.Ct. at 1030.

*Otter Tail* does not answer our problem here, however, because in that case the government was willing to sell power and the refusal to wheel was the only obstacle preventing the sale. Here Mississippi Power never refused any SEPA request to wheel power. Nor is the restrictive contract provision in SEPA's agreement with Mississippi Power, although perhaps analogous to that condemned in *Otter Tail*, necessarily a source of liability. The contract condemned there was the product of a monopolist's illegal efforts to preserve his market power—the government was in a sense made the victim of anticompetitive conduct. As we shall explain, a different result obtains where a restrictive contract with the government is not the result of such illegal activity.

### IV

The restrictive provision in the SEPA-Mississippi Power contract is a symptom of the conduct actually challenged by Greenwood: the activities of Mississippi Power and its affiliates in the Southern Company that caused SEPA to make its initial decision to market federal power exclusively in the Southern system's service area, allegedly giving rise to the bilateral monopoly described by Copeland and allegedly influencing SEPA's decision not to allocate power to Greenwood and the terms of its contract with Mississippi Power. The legality of these activities turns, we think, on the applicability of the *Noerr-Pennington* doctrine to this case. That doctrine allows individuals or businesses to petition the government, free of the threat of antitrust liability, for action that may have anticompetitive consequences. *Noerr-Pennington* protection is grounded on the theory that the right to petition guaranteed by the First Amendment extends to petitions for selfish, even anticompetitive ends. As the Court explained when it announced the doctrine in *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961),

[a] construction of the Sherman Act that would disqualify people from taking a public position on matters in which they were financially interested would thus

combine or conspire in violation of Section 1. As we noted in *Century Oil*, given *Copperweld* there is no relevant difference between combinations by a corporation and its wholly owned subsidiary and combinations by two or more corporations wholly owned by a third corpora-

tion. "A contract between them does not join formerly distinct economic units. In reality they have always had 'a unity of purpose or a common design.'" 737 F.2d at 1317, quoting *Copperweld*, 104 S.Ct. at 2742.

deprive the government of a valuable source of information and, at the same time, deprive the people of their right to petition in the very instances in which that right may be of the most importance to them.

*Id.* at 139, 81 S.Ct. at 530–531.

The conduct protected in *Noerr* was an advertising campaign by a group of railroads who hoped to persuade the Pennsylvania legislature to enact certain laws detrimental to the trucking industry. The Court later applied similar protection to anticompetitive petitions made to the executive and judiciary branches of government. *See United Mine Workers v. Pennington,* 381 U.S. 657, 669–72, 85 S.Ct. 1585, 1592–95, 14 L.Ed.2d 626 (1965) (extending *Noerr* protection to efforts to influence wage rates set by the Department of Labor); *California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 510, 92 S.Ct. 609, 611, 30 L.Ed.2d 642 (1972) (stating that *Noerr* protection extends to "the approach of citizens ... to administrative agencies ... and to courts...."). As the Court explained in *California Motor Transport,* "[c]ertainly the right to petition extends to all departments of government." 404 U.S. at 510, 92 S.Ct. at 612.

*Noerr-Pennington* protection is not without its limits, however. It protects only those activities which are bona fide efforts to obtain government action and does not authorize conduct that is "a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor." *Noerr,* 365 U.S. at 144, 81 S.Ct. at 533. Determining what efforts are not bona fide petitions to the government, and thus not protected, however, is a difficult task.[9] While the precise contours of these exceptions are as yet ill-defined, there appears to be agreement that both vexatious litigation and unlawful conspiracies with government officials are sham activities. *See, e.g., Associated Radio Service Co. v. Page Airways, Inc.,* 624 F.2d 1342, 1358 (5th Cir.1980), *cert. denied,* 450 U.S. 1030, 101 S.Ct. 1740, 68 L.Ed.2d 226 (1981) (vexatious litigation brought as a part of a scheme of unfair trade practices falls within the sham exception); *Affiliated Capital Corp. v. City of Houston,* 735 F.2d 1555, 1566 (5th Cir.1984) (en banc) (sham exception applied where proof showed that public official and governmental entity conspired with private participants in violation of the Sherman Act). *See generally* P. Areeda, *Antitrust Law* ¶ 203 (1982 Supp.) (listing these and other sham exceptions). In addition to these so-called sham exceptions, and more problematic, some courts have also declined to apply *Noerr-Pennington* protection in situations where the government acted as a buyer or seller in the marketplace and there was made a victim of anticompetitive conduct. *See, e.g., Hecht v. Pro-Football, Inc.,* 444 F.2d 931, 940–42 (D.C.Cir.1971), *cert. denied,* 404 U.S. 1047, 92 S.Ct. 701, 30 L.Ed.2d 736 (1972). *But see In re Airport Car Rental Antitrust Litigation,* 693 F.2d 84, 87–88 (9th Cir.1982), *cert. denied,* ⸻ U.S. ⸻, 103 S.Ct. 3114, 77 L.Ed.2d 1368 (1983) (holding that there is no "commercial exception" to the *Noerr-Pennington* doctrine).

–1–

▬ Applying the *Noerr-Pennington* doctrine to the relationship between SEPA and the Southern companies, we conclude that the bilateral monopoly relationship

9. The problem stems in part from the fact that determining whether the petitioning conduct was a sham often involves questions of motive or subjective intent. For example, the conduct protected by the Court in *Noerr* was an advertising campaign by the railroads directed against the trucking industry and intended to persuade the state legislature to enact laws detrimental to truckers. If the ad campaign had been instituted for the purpose of injuring the trucking industry directly, rather than in an effort to persuade the legislature to take action, the activity would have been a sham. Similarly, if a competitor instituted an action against his rival before a regulatory agency in order to force him to defend against the action rather than in hopes of a favorable agency ruling, the activity would not be bona fide petitioning conduct. Developing criteria to separate legitimate efforts from others is not simple. *See generally* P. Areeda, *Antitrust Law* ¶ 203 (1982 Supp.).

about which Greenwood complains, if it existed, was lawfully created. The relationship developed as a result of petitioning activity in the 1950's by officials of Mississippi Power and its sister companies in efforts to persuade SEPA to adopt the Southern companies' proposal for marketing federal hydropower. To be sure, SEPA initially did not agree with the companies' interpretation of its obligations to preference customers under Section 5 of the Flood Control Act and, as we have described, sought appropriations from Congress to construct its own transmission facilities and firming resources. The Southern companies, believing that such action might interfere with their own relationships with preference customers, argued to SEPA and to Congress that marketing federal hydropower through the existing facilities of the Southern companies or other private utilities would be the better course. Congress, by refusing to fund transmission facilities for SEPA, apparently accepted the companies' interpretation of SEPA's obligations under Section 5, and SEPA ultimately agreed as well, after some five years of negotiations with representatives of the Southern companies—negotiations which involved concessions by both sides.

These efforts by the Southern companies to convince the government to adopt their suggested marketing policy are undoubtedly protected by the First Amendment under the *Noerr-Pennington* doctrine, for it is such petitioning activity by interested individuals that provides the flow of information essential to the proper functioning of our democratic institutions. That the resulting marketing arrangements may have had some anticompetitive consequences is unimportant. The ultimate decision by the government to market power through the Southern companies reflected its implicit determination of how much competition was desirable. At any rate, the history of the companies' negotiating and lobbying efforts demonstrates that Congress and SEPA gave consideration to those problems, as well as concerns other than competition, when making their decisions. Nor does the possibility that the companies had

selfish or anticompetitive ends in mind when seeking to influence the government deprive them of *Noerr-Pennington* protection. As the Court explained in *Noerr*, "[t]he right of the people to inform their representatives in government of their desires with respect to the passage or enforcement of laws cannot properly be made to depend on their intent in doing so. It is neither unusual, nor illegal for people to seek action on laws in the hope that they may bring about an advantage to themselves and a disadvantage to their competitors." 365 U.S. at 139, 81 S.Ct. at 530.

–2–

Greenwood argues that *Noerr-Pennington* protection does not apply for three reasons: (1) the action Mississippi Power and its sister companies petitioned for was unlawful under Section 5 of the Flood Control Act; (2) there was an unlawful conspiracy with SEPA officials; and (3) SEPA was the victim of the Southern companies' bottleneck monopoly over transmission lines. We address each contention in turn.

Greenwood asserts that the Ninth Circuit's decision in *Santa Clara v. Andrus*, 572 F.2d 660 (9th Cir.), *cert. denied*, 439 U.S. 859, 99 S.Ct. 176, 58 L.Ed.2d 167 (1978), establishes that SEPA must sell to preference customers before selling to any non-preference customers. Thus, it argues, the arrangements sought by Mississippi Power and its sister companies whereby the company that wheeled for SEPA would buy unused SEPA capacity, despite the possible existence of unserved preference customers outside of the Southern system's service area, was an illegal end that is not protected by *Noerr-Pennington*. We disagree.

In the case of petitions for legislation that ultimately turns out to be unconstitutional, *Noerr-Pennington* protection still applies. *See Subscription Television, Inc. v. Southern California Theatre Owners*, 576 F.2d 230, 233 (9th Cir. 1978). A contrary rule would unduly chill petitioning conduct because it would "require an advocate to predict whether the

desired legislation would withstand a ... challenge in the courts and to expose itself to a potential treble damage antitrust action based on that prediction." *Id.* Similarly, in the administrative context, an ultimate determination that agency action sought was unauthorized by statute should not remove protection for petitioning conduct directed to the agency to obtain that action. Only where evidence shows that the defendant knew or should have known that the action he sought was improper would a court be justified in labeling his petitions a "sham" not entitled to *Noerr-Pennington* protection. *See generally* P. Areeda, *Antitrust Law* ¶ 203.2 (1982 Supp.). While we do not speculate on the requirements for making such a showing, it is safe to say that in the absence of proof of a conspiracy with government officials, when a defendant succeeds, as here, in persuading the government to adopt his position, his petitioning conduct should not be considered sham activity.

■ Greenwood argues again under *Santa Clara v. Andrus, supra,* that because Section 5 of the Flood Control Act creates an absolute preference for sales to public bodies and cooperatives over other customers, SEPA officials, by agreeing to the wheeling contracts with the Southern companies, acted outside the scope of their duties. Such unauthorized action on the part of government officials, Greenwood asserts, is sufficient to bring its claims within the "conspiracy with the government" sham exception.

We reject this contention because Greenwood has failed to adduce any evidence to support its conspiracy allegation. We have yet to define precisely what sort of conduct by public officials will support claims of conspiracy with the government. In *Affiliated Capital Corp. v. City of Houston,* 735 F.2d 1555 (5th Cir.1984) (en banc), where we held such conspiracy claims to be cognizable, public officials acted outside the scope of their responsibilities and conspired with the private defendants to deny plaintiffs access to the process created by the city for awarding cable television franchises. Because the concerted activity was not intended to influence public officials or to further any proffered goal of the city, *Noerr-Pennington* protection was inapplicable. Here, aside from Greenwood's suggestion that SEPA's construction of Section 5 was erroneous, there is no evidence of unauthorized activity. There were no allegations, nor was there any proof, that SEPA officials were corrupt or that they reached their decision in bad faith. For the reasons discussed above we do not think that the possibility that SEPA officials made an erroneous interpretation of the Flood Control Act is sufficient to remove *Noerr-Pennington* protection for the petitioning conduct. A contrary result would not only chill petitioning activity but also might unduly interfere with the proper functioning of government agencies, since the antitrust court would be reviewing government action outside the customary channels for judicial review of such decisions.

■ The most serious charge Greenwood levels that would preclude *Noerr-Pennington* protection is that Mississippi Power and its affiliates used their control over transmission lines to coerce SEPA into adopting a marketing policy that gave rise to the bilateral monopoly situation described by economist Copeland. Essentially, Greenwood concedes that we might find that *Noerr-Pennington* protects the lobbying efforts by the Southern companies which caused Congress to deny SEPA appropriations to build its own transmission and power firming facilities. The bilateral monopoly relationship that allegedly resulted from SEPA's agreements with the companies was nevertheless illegal, Greenwood argues, because the companies unlawfully leveraged Congress' decision by refusing to wheel power for SEPA until it agreed to the restrictive conditions in the transmission agreements that resulted in a Southern monopoly over necessary transmission facilities. While this contention might support antitrust liability, Greenwood has produced no evidence that such coercive conduct ever occurred.

The negotiations in the early 1950's between SEPA and the affiliates of Mississippi Power which resulted in transmission agreements by Georgia Power, and later Alabama Power, marked the beginning of the alleged bilateral monopoly relationship about which Greenwood complains. Those agreements were not readily accepted by the companies on the terms first proposed by SEPA because, as discussed earlier, all sales made by the government to preference customers were sales which would be lost by the companies. In addition, the companies expected some benefits from the firming and transmission arrangements made with the government because their own generating resources contributed substantially to the power benefits created. It is not surprising, therefore, that the bargaining proposals described in testimony before Congress, as well as SEPA internal memoranda, reflect compromises by SEPA and Southern companies on these issues.

 Although the bargaining power of the Southern companies obviously increased when Congress declined to appropriate funds for SEPA transmission facilities, Congress still retained the ability to build transmission lines. Nor has Greenwood adduced evidence to show that the Southern companies then owned the only private transmission lines available to SEPA. More importantly, the record before us, rather than reflecting a refusal to wheel federal power, indicates that negotiations continued between SEPA and Southern officials until a mutually acceptable arrangement could be worked out. Concessions were made by the Southern companies as well as SEPA.[10] In sum, the evidence developed in discovery points only to

a decision by SEPA to adopt the Southern companies' proposals in the 1950's because it believed that course to be the best means of achieving its responsibilities under Section 5 of the Flood Control Act.[11]

–3–

 Although we conclude that the bilateral monopoly situation that allegedly existed between SEPA and the companies of the Southern system was lawfully created, we must yet address the possibility that Mississippi Power and its affiliates used that monopoly power to deny Greenwood, and any other preference customers outside the Southern system, the federal hydropower at issue in this case. The lawful creation of monopoly power does not authorize monopolization, that is, the exercise of market power to preserve or extend the monopoly. If Mississippi Power and its affiliates used their control over necessary transmission facilities in the Georgia Power and Alabama Power service areas to coerce SEPA into restricting the allocation of the new federal power, then an antitrust violation may have occurred.

–a–

We assume for purposes of this opinion that the Southern companies enjoyed monopoly power over necessary transmission facilities, but we note that that proposition is not free from doubt. Greenwood argues that because the Southern companies successfully opposed Congressional appropriations for construction of SEPA transmission facilities and then convinced SEPA to market its power through the Georgia and Alabama systems, SEPA became depend-

10. For example, the Southern companies relented on their insistence that the government not contract directly with preference customers. The companies also agreed to include a provision in the wheeling contracts that would guarantee that the rate charged preference customers for supplemental power (the power requirements of the preference customers over and above that supplied by SEPA) would not be increased by the companies if the customers decided to purchase power from SEPA.

11. The sole proffered evidence in support of Greenwood's theory is a statement by Charles W. Leavy, a former SEPA official, in a hearing before the Nuclear Regulatory Commission. The Commission was evaluating a certain exclusive dealing provision contained in the 1956 contract between SEPA and Georgia Power. Leavy stated that SEPA accepted the challenged provision as proposed by Georgia Power because it was made a necessary condition to Georgia's agreement to wheel any power at all. This solitary hearsay statement, however, is not sufficient to raise a fact issue for trial.

ent upon the Southern companies' transmission facilities as its transmission needs increased. This dependence was so great, according to Greenwood's experts, that it would have been economically infeasible for SEPA to bypass the Southern system in marketing its power and therefore the Southern companies could effectively "dictate the terms of trade" to SEPA. However, as both Greenwood's experts admit when describing the negotiations over the sale of the power at issue, SEPA at one point suggested that if an acceptable arrangement could not be timely reached, it might bypass the Southern system entirely, although Greenwood asserts that this threat was "more imagined than real."

A more fundamental reason that the Southern companies may not have enjoyed monopoly power over SEPA is that SEPA is not an ordinary economic actor—it is the government. The essence of the marketing choice by the government here was that it would construct neither transmission lines nor necessary supporting thermal units. The government could at any time have made a different political choice and bypassed the Southern companies; thus the "market" power of the Southern companies was dependent on the continued vitality of the political idea that the purpose of the Flood Control Act is best served by this cooperative government-private enterprise venture. Greenwood suggests that such a move by the government was infeasible because it would have been prohibitively expensive as well as duplicative of existing private transmission facilities, but such arguments, while undoubtedly forceful, ignore the reality that the efficiency of this allocation of resources is not being assured by market forces. In wheeling power for SEPA the Southern companies are performing a function that the government could have performed itself and can yet perform whenever it chooses. With the Southern companies' market power licensed from the government, it is fair to ask which of the parties is the captive.

This concern is perhaps no more than a subset of the larger problem of applying the antitrust laws in the heavily regulated utility industry. Utilities are regulated by government in recognition of the fact that power generation and transmission, with its large fixed distribution costs and ever decreasing marginal cost of product, is by necessity of economies of scale a species of natural monopoly. As Justice Stewart observed in his dissent in *Otter Tail:*

> The very reason for the regulation of private utility rates—by state bodies and by the Commission—is the inevitability of a monopoly that requires price control to take the place of price competition. Antitrust principles applicable to other industries cannot be blindly applied to a unilateral refusal to deal on the part of a power company, operating in a regime of rate regulation and licensed monopolies.

410 U.S. at 389, 93 S.Ct. at 1035 (Stewart, J., dissenting). Given the existence of the extensive energy regulatory framework it can be argued that decisions such as those at issue in this case should be evaluated within that framework alone rather than in the "invariably less sensitive and less specifically expert process of antitrust litigation." *Id.* at 391, 93 S.Ct. at 1036. These concerns were raised and rejected in *Otter Tail,* however, and we do not rest our decision on this ground. Rather, we surface these concerns so that we will not mistakenly be understood to pretend a full understanding of the fit of the antitrust laws to a regulated utility—a government-created natural monopoly.

–b–

 In arguing that Mississippi Power unlawfully exercised monopoly power, Greenwood first points to various statements made by SEPA officials and others to the effect that the Southern companies needed the new power and had indicated to SEPA that they desired to keep it within the Southern system. Greenwood also suggests that the important role the companies played in SEPA's determination of its new marketing area indicates that SEPA was not truly independent of the Southern companies, else it would not have consulted so extensively with them. In addition, Green-

wood points to statements made by Southern officials in the course of negotiations for the marketing of the new power to the effect that if SEPA sold to customers outside of the Southern system, less dependable capacity would be made available to SEPA for sale to preference customers. Greenwood does not dispute the accuracy of that statement but urges that it constituted a threat that Southern would impose in the transmission agreements unfavorable terms regarding the amounts of capacity power available for sale to preference customers if SEPA sold outside the Southern system.

Inferences of monopolistic conduct from the Southern companies' negotiations with SEPA are not available, however, because such conduct is protected by *Noerr-Pennington*. That is not to say that a monopolist, assuming he had the power, might dictate terms of trade to the government free of antitrust liability. Arguably, such conduct would not be "petitioning" protected by the First Amendment. But there is no evidence that Mississippi Power did so. There is no evidence of a refusal to wheel power by the Alabama and Georgia systems in efforts to persuade SEPA to limit the market for the new power. That less capacity power would be available if SEPA chose to go outside the Southern system is hardly ominous; it is necessarily the case under this reciprocal power marketing plan. As we explained, the Southern companies expected that some of the capacity produced by their firming and transmission resources would be made available for their own use in exchange for the wheeling agreements. If power were to be sold outside the system, concessions from SEPA on the amounts of dependable capacity to be

made available for sale were inevitable. Each turn of the power valves made to match the hydro and fossil fuel sources is, in turn, an adjustment of the power available for distribution elsewhere. Surely, each turn of the valve is not subject to antitrust scrutiny, despite its necessarily preemptive effect upon the power available for other potential customers.

Greenwood also suggests that the exercise of monopoly power by Mississippi Power and its affiliates can be inferred from the absence of technical or economic obstacles to wheeling power to Greenwood. Therefore, Greenwood asserts, SEPA must have denied power to Greenwood because SEPA considered it infeasible to obtain wheeling for the power from the Southern companies. Such disagreement with SEPA's explanations, however, does not raise an inference of monopolization because Greenwood is quarreling with SEPA's decision on grounds that were not necessarily the basis for that decision.[12]

The strongest evidence that Mississippi Power and its affiliates unlawfully exerted monopoly power is the conclusory testimony to that effect by Greenwood's experts, Russell and Copeland. Ordinarily such testimony might be sufficient to present questions of fact. *See In re Japanese Electronic Products Antitrust Litigation,* 723 F.2d 238, 278–79 (3d Cir.1983). The experts here, however, relied almost exclusively on conduct that we have determined to be protected under the *Noerr-Pennington* doctrine in reaching their conclusions that the Southern companies exerted monopoly power. Thus their conclusory ex-

---

12. SEPA explained to Greenwood that it had thoroughly considered Greenwood's request for power but for a number of reasons declined to honor it. SEPA reasoned first that such an extension of the marketing area might spread power resources too thinly because other preference entities similarly situated to Greenwood might also press requests for power were Greenwood given an allocation. SEPA also pointed to the fact that firming and transmission costs might be increased if the marketing area were extended off of the Southern system.

Greenwood's expert, Whitfield Russell, an engineer, swore that "[t]his series of statements by SEPA and Interior officials, although sometimes correct, are not based upon solid engineering, system planning or ratemaking principles." Such principles are not necessarily the sole criteria for judging SEPA's performance, however, and are unresponsive to the reasons given Greenwood for denying it power.

pert testimony presented no fact issue for trial.

–4–

We have thus far concluded that the activities of Mississippi Power and its affiliates that created the alleged bilateral monopoly relationship between the Southern Companies and SEPA were lawful. We must yet decide whether the restrictive marketing provision embodied in Paragraph 4.1 of the SEPA-Mississippi Power contract, which prohibits SEPA from selling power to preference customers located outside of Mississippi Power's service area where SEPA wheels that power through the Southern companies, constitutes an unreasonable restraint of trade. Although this provision is concededly not the cause of the government's decision not to sell power to Greenwood, since that decision preceded the execution of the accused contract, Greenwood argues that the provision sufficiently threatens it with competitive injury that it is entitled to injunctive relief. We conclude that it is implicit in what we have decided thus far about the scope of *Noerr-Pennington* protection, as applied to the activities that caused SEPA to make its marketing decisions, that no antitrust consequences attach to the government decision embodied in this contract provision.

Greenwood urges that *Noerr-Pennington* protection does not extend to the restrictive contract provision itself even though the doctrine might protect the conduct that caused the government to adopt it, relying on *Cantor v. Detroit Edison Co.*, 428 U.S. 579, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1976), and its progeny. *See, e.g., City of Kirkwood v. Union Electric Co.*, 671 F.2d 1173 (8th Cir.1982), *cert. denied,*

459 U.S. 1170, 103 S.Ct. 814, 74 L.Ed.2d 1013 (1983). In *Cantor* government approval of Detroit Edison's tariff was held to be insufficient to provide antitrust immunity for anticompetitive provisions contained therein although the petitioning conduct of the utility in seeking government approval for its tariff was conceded to be protected activity.

We do not question the soundness of the decision in *Cantor,* but we do not think it supports the broad rule Greenwood would have us adopt—that *Noerr-Pennington* protects only petitioning conduct, not anticompetitive restraints that may result from such conduct. The *Cantor* decision cannot support such a rule because in *Cantor* the restraint complained of was not created by government action but by private parties. The Court carefully distinguished the state action exemption of *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), as inapplicable on the grounds that *Parker* was a case where the restraint was imposed by government action rather than private conduct. *See* 428 U.S. at 602, 96 S.Ct. at 3123.[13] Here, by contrast, the challenged restraint embodies the government's decision to market power in a certain way; it is not simply government approval of private conduct. SEPA and its agents who made the decision are, of course, not subject to the antitrust laws. *Sea-Land Service, Inc. v. Alaska Railroad,* 659 F.2d 243, 245–47 (D.C.Cir.1981), *cert. denied,* 455 U.S. 919, 102 S.Ct. 1274, 71 L.Ed.2d 459 (1982). That Mississippi Power, a private entity, is a party to the agreement effecting the government's decision should not create antitrust consequences for the anticompetitive aspects of the arrangement.

---

**13.** The Court in *Cantor* made plain that the anticompetitive scheme challenged there—a program whereby Detroit Edison provided its customers with light bulbs at no charge—was created by the utility long before the government agency became involved and that it was the option of the utility to have and continue the program, not the government. Thus the Court felt justified in concluding that the restraint was not simply the result of government action:

When regulation merely takes the form of approval of a tariff proposed by the company, it surely has not increased the company's risk of violating the law. The respondent utility maintained its lamp-exchange program both before and after it was regulated. The approval of the program by the Michigan Commission provided the company with an arguable defense to the antitrust charge, but did not increase its exposure to liability.
428 U.S. at 599–600, 96 S.Ct. at 3121–3122.

This result is compelled if *Noerr-Pennington* protection is to have meaning in the context of agreements with the government. First Amendment petitioning privileges would indeed be hollow if upon achieving a petitioned-for end the petitioner were then subjected to antitrust liability for his success. There would be no question about Mississippi Power's protected status if it had persuaded the Interior Department to promulgate a regulation requiring SEPA to pursue a similar restrictive marketing arrangement. We see no reason why the result should be different when the government's decision is embodied in a contract with a private entity rather than in a regulation or statute. In all three cases it is the action of the government, rather than of private parties, that allegedly harms competition.

That is not to say that every private party who contracts with the government is entitled to antitrust immunity, but the protected status of the agreement adopted ought properly to hinge on the protected status of the petitioning conduct that sought the government action. This rule—

the sham exception to *Noerr-Pennington* —governs liability for competitive restraints adopted by the government in the form of laws or regulations, and we think it can apply as well in the area of government contracts. We reject any notion that there should be a commercial exception to *Noerr-Pennington*, because although such a distinction may be intuitively appealing it proves difficult, if not impossible, of application in a case such as ours where the government engages in a policy decision and at the same time acts as a participant in the marketplace.[14]

In most contract cases the question will be whether the government has been made the victim of anticompetitive conduct. If a monopolist uses his market power to dictate the terms of trade to the government, for example, no legitimate petitioning conduct would be involved, and there would be no *Noerr-Pennington* protection. *Otter Tail* was such a case. The restrictive contracts at issue there were agreed to by the government only at monopolist Otter Tail's insistence. *See* 410 U.S. at 379, 93 S.Ct. at 1030. We recognize that there may well be cases where a government agency acting

---

**14.** Some courts have suggested a commercial-governmental dichotomy to distinguish agreements with the government that are protected from those that are not. *See, e.g., Hecht v. Pro-Football, Inc.,* 444 F.2d 931, 939 (D.C.Cir. 1971), *cert. denied,* 404 U.S. 1047, 92 S.Ct. 701, 30 L.Ed.2d 736 (1972); *George R. Whitten, Jr. v. Paddock Pool Builders,* 424 F.2d 25, 33–34 (1st Cir.), *cert. denied,* 400 U.S. 850, 91 S.Ct. 54, 27 L.Ed.2d 88 (1970). The idea is that there should be protection where the state either creates or contracts with a private entity which becomes the state's sole instrumentality in carrying out what would otherwise be a governmental function, *see, e.g., E.W. Wiggins Airways, Inc. v. Massachusetts Port Authority,* 362 F.2d 52 (1st Cir. 1966), *cert. denied,* 385 U.S. 947, 87 S.Ct. 320, 17 L.Ed.2d 226 (1966) (no antitrust liability where government body let an exclusive contract for essential support services at Boston's Logan Airport), but that *Noerr-Pennington* protection is inapplicable where the government engages in a purely commercial decision.

This distinction is easy to apply in cases at either extreme. All would agree that antitrust liability should not attach in exclusive franchise agreements such as that in *E.W. Wiggins Airways,* and that, conversely, if as the result of a price fixing agreement by private parties the government pays more for products it purchas-

es in the marketplace, the participants in the anticompetitive scheme should not escape liability because of the identity of the victim. The lines are not always so clearly drawn, however, as the present case indicates. We agree with the Ninth Circuit that there should be no commercial exception to *Noerr-Pennington* and that the protected status of commercial arrangements with government should hinge on the protected status of the petitioning conduct itself. *See In re Airport Car Rental Antitrust Litigation,* 693 F.2d 84, 87–88 (9th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 3114, 77 L.Ed.2d 1368 (1983).

Although some have suggested that our own decision in *Woods Exploration & Producing Co. v. Aluminum Co. of America,* 438 F.2d 1286 (5th Cir.1971), *cert. denied,* 404 U.S. 1047, 92 S.Ct. 701, 30 L.Ed.2d 736 (1972), espoused the commercial exception, we think that such a characterization is erroneous. *Woods* held that where the defendants filed false information with the Texas Railroad Commission their activities constituted an abuse of the administrative process and were not entitled to First Amendment protection. Such conduct falls within the sham exception to the *Noerr-Pennington* doctrine. *See generally* P. Areeda, *Antitrust Law* ¶ 204 (1982 Supp.).

as buyer, seller or competitor in the marketplace voluntarily becomes party to agreements that restrain trade without being made the "victim" of a private defendant. To hold that the antitrust laws do not reach such arrangements is not to say that there is no remedy for the violation, however. The remedy simply lies elsewhere in the form of petitions to government to change its decision.[15] We know of no other way to give effect to the basic principle of *Noerr-Pennington* that it is lawful to petition the government for anticompetitive action.

Applying the principles outlined here, we hold that the restrictive provision in the SEPA-Mississippi Power contract of August 1, 1976 cannot be unlawful as an unreasonable restraint of trade. There is no evidence that the government was made the victim of the alleged monopoly power of Mississippi Power and its affiliates. There was no refusal to wheel power, no dictating the terms of trade to the government. Rather there is only evidence of a decision by SEPA, encouraged by the petitioning conduct of the Southern companies, to adopt a restrictive plan for marketing power. An antitrust court should not second-guess such government action even though that action may take the form of an agreement in restraint of trade.

In sum, Greenwood's argument that Mississippi Power and its affiliates used a bilateral monopoly situation to convince SEPA to adopt a restrictive marketing strategy for its power is not supported by evidence sufficient to go to trial. Even assuming that the Southern companies had the ability to dictate the terms of trade to SEPA, the assertedly damaging evidence related by Greenwood's experts describes protected petitioning activity, the coercive overtones of which evaporate in the context of negotiations for marketing the power. Such evidence could not support a conclusion by a trier of fact that Mississippi Power used monopoly power to obtain unlawful restrictions in SEPA's arrangements for marketing the federal hydropower at issue. The restrictive arrangements incorporated in the SEPA-Mississippi Power contract are also lawful as products of petitioning activity protected by the First Amendment.

Because there were no issues of fact for trial that might support antitrust liability, the magistrate's grant of summary judgment is AFFIRMED.

---

15. Indeed such a course of action has been pursued by Greenwood in the present case. Greenwood has filed suit against the Department of Energy requesting a retroactive allocation of SEPA power. *See Greenwood Utilities Commission v. Schlesinger,* 515 F.Supp. 653 (M.D.Ga.1981) (partial summary judgment in favor of Department of Energy), *complaint dismissed as moot,* Civil Action No. 77–179–MAC (August 21, 1984), *appeal pending* No. 84–8069 (11th Cir.1984).