**TOTAL BENEFIT SERVICES, INC.,**

v.

**GROUP INSURANCE ADMINISTRATION, INC., Group Insurance Administration of Louisiana, Inc. and Robert H. Carter, III.**

**Civ. A. No. 92–2386.**

United States District Court, E.D. Louisiana.

Feb. 8, 1995.

Paula Anne Perrone, Law Offices of Paula Perrone, Raphael A. Benitez, III, George B. Recile, New Orleans, LA, for Total Ben. Services, Inc.

Leon Gary, Jr., Davis B. Allgood, Gary, Hicks, Field & Bradford, Baton Rouge, LA, Steven M. Stastny, Feingerts & Kelly, New Orleans, LA, Dennis E. Kelly, Dennis E. Kelly, APLC, James LaRue Harmon, James L. Harmon, New Orleans, LA, for Group Ins. Admin., Inc., Group Ins. Admin. of Louisiana, Inc. and Robert H. Carter, III.

Kim Maria Boyle, Rodney, Bordenave & Boykin, New Orleans, LA, for Regional Transit Authority.

Paula Anne Perrone, Law Offices of Paula Perrone, New Orleans, LA, for A. Michael Lawrence.

### MEMORANDUM AND ORDER

VANCE, District Judge.

This is an action asserting claims under the federal antitrust laws and various state law theories by Total Benefit Services, Inc. ("TBS"), a provider of health care financing services. Defendants are Robert H. Carter, III ("Carter") and two entities affiliated with Carter, Group Insurance Administration of Louisiana, Inc. ("GIA–LA"), and Group Insurance Administration, Inc. ("GIA"). These entities likewise provide health care financing services. This matter is now before the Court on defendants' motions for partial summary judgment on the antitrust claims, voluntary dismissal of their counterclaim, and dismissal for lack of subject matter jurisdiction of the state law claims. The Court heard oral argument on the motions. Following the arguments, the Court granted the motions, with written reasons to follow. The following reasons underlie the Court's decision.

### I. Factual Background

TBS is a Louisiana corporation that engages in various aspects of the health care financing business. Its principals, A. Michael Lawrence and Sandra DeBlanc, purchased the business in 1989 for $60,000. TBS provides claims administration and reinsurance brokerage services primarily to entities that provide self-insured health benefit plans to their employees. Through subcontractors, TBS also offers preferred provider organization ("PPO") networks to its customers.

Defendant GIA–LA is likewise a Louisiana corporation that provides various forms of health care financing services, including its own PPO. GIA–LA markets claims administration services alone and in conjunction with its PPO services. GIA–LA also offers a health maintenance organization ("HMO") through a subcontractor and indemnity-style health insurance through a joint venture.

Defendant GIA is an Illinois corporation that provides health care financing services in several parts of the United States. Carter is the president of both GIA and GIA–LA. At the time this lawsuit was filed, Carter owned 100% of GIA–LA and 95% of GIA. In a January 1993 reorganization, Carter formed a holding company, GIA–USA, which owns 100% of GIA–LA and 95% of GIA. Carter owns 95% of the voting stock of the holding company.

This lawsuit arises out of the parties' involvement in the City of New Orleans' employee health benefit plan. TBS was the successful low bidder on a contract to serve as the third party administrator of the city's self-funded health care plan. As a third party administrator ("TPA"), TBS receives claims, determines whether and to what extent charges are reimbursable by the city, and writes checks on a city bank account in payment of claims. In January 1992, the city also hired GIA–LA to provide discounted health care services to city employees through its PPO network. Under the system adopted, TBS and GIA–LA were required to work together to administer claims under the city's health care plan. Claims went first to GIA–LA for repricing based on the city's discount, then to TBS for eligibility determination. TBS then paid GIA–LA for claims due its PPO providers, from which GIA–LA deducted fees due it as administrator of the PPO. The dual system of administration proved cumbersome, and it was plagued by mistakes and delays. Both parties blamed these administrative problems on each other.

Indeed, the gravamen of plaintiff's claims in this case is that defendants and co-conspirators, including former Mayor Sidney Bartholemy and Cheryl Cramer, a member of the Orleans Parish School Board, conspired to create delays and other difficulties in the administration of the city's plan to make plaintiff look bad. Plaintiff further alleges that the conspirators spread false information about plaintiff's services and generated adverse publicity about its business in order to eliminate plaintiff as a competitor for third party administration services to be provided to governmental and quasi-governmental health plans in the New Orleans area. Plaintiff claims that this alleged conspiracy violated Section 1 of the Sherman Act. *See* 15 U.S.C. § 1. Additionally, plaintiff relies on the same conduct as the basis of its claims that defendants attempted to monopolize and conspired to monopolize the market under Section 2 of the Sherman Act. *See id.* § 2. Finally, plaintiff asserts that this conduct amounts to defamation, tortious interference with contractual relations, and unfair trade practices under state law.

Defendants challenge plaintiff's antitrust claims on a number of grounds. First, defendants contend that plaintiff's Section 1 and Section 2 claims must fail because plaintiff cannot prove a valid relevant market and defendants' power in that market. Second, defendants attack plaintiff's conspiracy claims as legally and factually deficient. Third, defendants claim that plaintiff cannot prove "antitrust injury," an element of antitrust standing under Section 4 of the Clayton Act. Because the Court has determined that defendants' first two arguments are legally sufficient to warrant the entry of summary judgment on the antitrust claims, the Court need not reach the third argument.

## II. *Legal Analysis*

■ The standard for the entry of summary judgment is a familiar one. The moving party must demonstrate that there is no genuine issue of material fact and that it is entitled to summary judgment as a matter of law. Fed.R.Civ.Pro. 56(c). Summary judgment is warranted when a party fails to prove an essential element of its case as to which that party has the burden of proof. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). In antitrust conspiracy cases, plaintiff must prove more than conduct that is as consistent with permissible competition as with illegal conspiracy in order to create a triable issue of conspiracy under the antitrust laws. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 597 n. 21, 106 S.Ct. 1348, 1361 n. 21, 89 L.Ed.2d 538 (1986); *Monsanto Co. v. Spray–Rite Serv. Corp.,* 465 U.S. 752, 763–64, 104 S.Ct. 1464, 1470–71, 79 L.Ed.2d 775 (1984). Rather, plaintiff must proffer evidence that tends to negate the possibility that defendants were acting lawfully.

### A. *The Relevance of the Market.*

■ The Court agrees with defendants that plaintiff's antitrust claims under both Section 1 and Section 2 of the Sherman Act for the most part rise or fall with the issue of the relevant market and defendants' power in that market. Plaintiff's Section 1 claim in essence alleges that defendants conspired to

eliminate TBS as a competitor by using unfair competitive practices. Such conduct does not amount to a per se violation of the Sherman Act. *See Union City Barge Line, Inc. v. Union Carbide Corp.*, 823 F.2d 129, 138 (5th Cir.1987) (holding that unfair competition is not per se illegal under Sherman Act); *Northwest Power Prods., Inc. v. Omark Indus.*, 576 F.2d 83, 88 (5th Cir.1978), *cert. denied*, 439 U.S. 1116, 99 S.Ct. 1021, 59 L.Ed.2d 75 (1979) (same). Accordingly, plaintiff's claims under Section 1 of the Sherman Act must be assessed under the rule of reason. *Union City Barge Line, Inc.*, 823 F.2d at 138 (applying rule of reason analysis to unfair competition claim). *See generally National Soc'y of Professional Eng'rs v. United States*, 435 U.S. 679, 691, 98 S.Ct. 1355, 1365, 55 L.Ed.2d 637 (1978) (discussing rule of reason).

■ Under the rule of reason, the inquiry is limited to the market impact of the challenged conduct on competition. *National Soc'y of Professional Eng'rs*, 435 U.S. at 691 & n. 17, 98 S.Ct. at 1365 & n. 17. This analysis requires definition of the relevant market in both its product and geographic dimensions. *Hood v. Tenneco Texas Life Ins. Co.*, 739 F.2d 1012, 1018 (5th Cir.1984) (holding that rule of reason plaintiff must prove adverse effect on competition in properly defined product and geographic markets). Then the effect of the challenged conduct on competitive conditions in the market so defined must be assessed. *See United States v. Arnold, Schwinn & Co.*, 388 U.S. 365, 375, 87 S.Ct. 1856, 1863–64, 18 L.Ed.2d 1249 (1967). The restraint must have a substantial anticompetitive impact to be unreasonable. *Id.* (requiring "substantially adverse" impact); *United States v. Realty Multi–List, Inc.*, 629 F.2d 1351, 1372 n. 39 (5th Cir.1980) (requiring substantial impact on competition). The number of firms in the relevant market and their market shares are relevant to this inquiry. *See Kestenbaum v. Falstaff Brewing Corp.*, 575 F.2d 564, 571 (5th Cir.1978), *cert. denied*, 440 U.S. 909, 99 S.Ct. 1218, 59 L.Ed.2d 457 (1979). In addition, if the defendants lack market power, that is, the power to raise prices above competitive levels, their conduct is not likely to have the required impact on competition. *See NCAA v. Board of Regents*, 468 U.S. 85, 109 n. 38, 104 S.Ct. 2948, 2964 n. 38, 82 L.Ed.2d 70 (1984) (defining market power); *Goss v. Memorial Hosp. Sys.*, 789 F.2d 353, 355 (5th Cir.1986); *Ball Memorial Hosp., Inc. v. Mutual Hosp. Ins., Inc.*, 784 F.2d 1325, 1334–35 (7th Cir.1986); *Jack Walters & Sons Corp. v. Morton Bldg., Inc.*, 737 F.2d 698, 702 (7th Cir.), *cert. denied*, 469 U.S. 1018, 105 S.Ct. 432, 83 L.Ed.2d 359 (1984) (holding that market power is prerequisite to show rule of reason violation).

■ Plaintiff's claim of attempted monopolization under Section 2 of the Sherman Act likewise requires proof of the relevant product and geographic markets.[1] *See C.E. Servs., Inc. v. Control Data Corp.*, 759 F.2d 1241, 1244 (5th Cir.), *cert. denied*, 474 U.S. 1037, 106 S.Ct. 604, 88 L.Ed.2d 583 (1985) (holding that proof of relevant market is prerequisite to success on attempted monopolization claim under Section 2 of Sherman Act); *In re Beef Indus. Antitrust Litig.*, 713 F.Supp. 971, 979 (N.D.Tex.1988), *aff'd*, 907 F.2d 510 (5th Cir.1990) (same). This requirement flows from the elements of an attempted monopolization claim, which are: 1) a specific intent to control prices or destroy competition in the relevant market; 2) predatory or anticompetitive conduct toward that end; and 3) a "dangerous probability of success" in attaining a monopoly in the relevant market. *See, e.g., Spectrum Sports, Inc. v. McQuillan*, —— U.S. ——, 113 S.Ct. 884, 122 L.Ed.2d 247 (1993); *H.L. Hayden Co. v. Siemens Medical Sys., Inc.*, 879 F.2d

---

**1.** Plaintiff asserts that defendants are precluded from challenging plaintiff's market definition because defendants asserted a similar definition in a counterclaim. This contention is without merit. Plaintiff has the burden of proof on this issue, and defendant's counterclaim allegations do not relieve plaintiff of this burden. Further, defendant's answer denied plaintiff's allegations on this subject, which put the matter in issue.

Plaintiff also argues that defendants may not now rely on expert testimony to disprove plaintiff's definition of the relevant market. This argument is premised on the notion that the relevant market is not a fact in issue because of defendants' counterclaim allegations. For the reasons already stated, the Court has determined that relevant market is very much in issue, and as such, it is an appropriate subject for expert testimony.

1005, 1017–18 (2d Cir.1989). A definition of the market is essential because otherwise there is no context in which to determine whether defendant had the ability to lessen or destroy competition. *See Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.,* 382 U.S. 172, 177, 86 S.Ct. 347, 350, 15 L.Ed.2d 247 (1965); *Photovest Corp. v. Fotomat Corp.,* 606 F.2d 704, 711 (7th Cir.1979), *cert. denied,* 445 U.S. 917, 100 S.Ct. 1278, 63 L.Ed.2d 601 (1980).

The primary criterion in determining whether defendants have satisfied the third element of an attempted monopolization claim, *i.e.,* a dangerous probability of success in monopolizing the relevant market, is defendants' share of the relevant market. *See, e.g., Spectrum Sports, Inc. v. McQuillan,* —— U.S. at ———————, 113 S.Ct. at 891–92; *Twin Labs. v. Weider Health & Fitness,* 900 F.2d 566, 570 (2d Cir.1990) (finding that market share is primary indicator of dangerous probability); *Colorado Interstate Gas Co. v. Natural Gas Pipeline Co.,* 885 F.2d 683, 694 (10th Cir.1989), *cert. denied,* 498 U.S. 972, 111 S.Ct. 441, 112 L.Ed.2d 424 (1990) (same). Market shares of 50% or more generally have satisfied the "dangerous probability" element. *See, e.g., American Tobacco Co. v. United States,* 328 U.S. 781, 797, 66 S.Ct. 1125, 1133, 90 L.Ed. 1575 (1946) (66% market share); *Arthur S. Langenderfer, Inc. v. S.E. Johnson Co.,* 917 F.2d 1413, 1443 (6th Cir. 1990), *cert. denied,* 502 U.S. 899, 112 S.Ct. 274, 116 L.Ed.2d 226 (1991) (58% share); *Columbia Metal Culvert Co. v. Kaiser Aluminum & Chem. Corp.,* 579 F.2d 20, 25–26 n. 5, 31 (3d Cir.), *cert. denied,* 439 U.S. 876, 99 S.Ct. 214, 58 L.Ed.2d 190 (1978) (80% market share). Besides market share, other factors relevant to the "dangerous probability" analysis include barriers to entry, potential competition, market concentration, and trends toward greater or lesser concentration. *See, e.g., C.A.T. Indus. Disposal, Inc. v. Browning–Ferris Indus.,* 884 F.2d 209, 211 (5th Cir.1989) (examining market concentration, consumer demand, entry barriers, and consolidation trends).

The offense of conspiracy to monopolize, also alleged here, does not require proof of market power or dangerous proba-

bility of success of achieving a monopoly in a relevant market. *Hunt–Wesson Foods, Inc. v. Ragu Foods, Inc.,* 627 F.2d 919, 926 (9th Cir.1980), *cert. denied,* 450 U.S. 921, 101 S.Ct. 1369, 67 L.Ed.2d 348 (1981). Rather, plaintiff must prove the existence of a conspiracy, specific intent to monopolize, and an overt act in furtherance of a conspiracy. *Northern Mississippi Communications, Inc. v. Jones,* 792 F.2d 1330, 1335 (5th Cir.1986). However, the existence, or lack thereof, of market power in the relevant market is relevant to whether defendants had the specific intent to monopolize. *Perington Wholesale v. Burger King Corp.,* 631 F.2d 1369, 1377 (10th Cir.1979) (finding that market power is relevant to the issue of intent); *Bowen v. New York News, Inc.,* 522 F.2d 1242, 1258 (2d Cir.1975), *cert. denied,* 425 U.S. 936, 96 S.Ct. 1667, 48 L.Ed.2d 177 (1976) (same).

Moreover, the Fifth Circuit in *In re Beef Industry Antitrust Litigation,* 907 F.2d 510 (5th Cir.1990), considered the structure of the relevant market in affirming the dismissal of a Section 2 conspiracy claim on summary judgment. The court found that the claimed conspiracy was not economically feasible in light of evidence that there were four major market participants and 471 smaller competitors. *Id.* at 516. The court stated that any attempt at conspiracy by two competitors in such a market "could not succeed" because the nonconspiring competitors could counteract efforts at anticompetitive behavior. *Id.* Hence, market definition is clearly relevant to the viability of plaintiff's Section 2 conspiracy claim. Indeed, *In re Beef* teaches that if the structure of the relevant market is so fragmented as to render the claimed conspiracy economically infeasible or impossible, summary judgment is appropriate. *See also Matsushita,* 475 U.S. at 593, 106 S.Ct. at 1359 ("[C]ourts should not permit factfinders to infer conspiracies when such inferences are implausible....").

**B. *Definition of the Relevant Market.***

The parties here have reached different conclusions as to the proper definition of the relevant market, although they agree on many underlying facts. TBS claims that the relevant market is governmental, quasi-

governmental, and municipal entities utilizing self-funded health plans in the City of New Orleans.[2] So defined, TBS initially claimed that the relevant market was limited to the health care plans of four customers, the City of New Orleans, the Orleans Parish School Board ("School Board"), the United Teachers of New Orleans, and the Regional Transit Authority ("RTA").[3] It subsequently added four other governmental customers and claims that GIA had in excess of 51% to 55% of the third-party administration contracts in this market.[4] Plaintiff concedes that it also supplies third-party administration services to nongovernmental entities with self-funded health plans in New Orleans. It apparently justifies excluding these entities from the relevant market on the grounds that tax dollars are not used to fund these plans, although it admits that the services it provides these plans are substantially the same as those provided to self-funded governmental plans.[5]

TBS also justifies its market definition on the grounds that it competes with the defendants for the business of four of the entities it included in the market. Finally, TBS argues that defendant is minority-controlled and that the "politicians controlling" the contracts of the City of New Orleans, the RTA and the School Board were of the same minority.[6] TBS claims that these entities include "minority participation" as a consideration in selecting health care service suppliers, which restricts the number of potential suppliers.[7]

Plaintiff concedes that employers and other purchasers of health care benefits face a "broad array" of products, all of which involve claims administration.[8] Plaintiff justifies excluding all other products except for self-insurance with TPA on the grounds that "[s]elf-funded plans are universally less expensive."[9] However, plaintiff offered no evidence that this asserted cost advantage exists, or that the cost advantage was a determining factor preventing other products from serving as substitutes. Indeed, plaintiff offered no expert testimony at all in support of its market definition.

Defendants take a broader view of the relevant market. They contend that the relevant market is health care financing or health benefits and that the geographic market is at least nationwide. So defined, defendants claim to have no market power in the relevant market, so that their conduct is beyond the reach of the antitrust laws as to the types of claims alleged here. Defendants offered the affidavits of three experts in support of their proposed market definition.[10]

 Based on the evidence in the record, the Court finds that plaintiff's proffered market definition is unsupported by any evidence of marketplace reality. The relevant product market must include all products, the use of which is reasonably interchangeable. *See United States Healthcare, Inc. v. Healthsource, Inc.*, 986 F.2d 589, 599 (1st Cir.1993) (discussing product interchangeability); *Pennsylvania Dental Ass'n v. Medical Serv. Ass'n*, 745 F.2d 248, 260 (3d Cir. 1984), *cert. denied*, 471 U.S. 1016, 105 S.Ct. 2021, 85 L.Ed.2d 303 (1985) (same); *R.D. Imports Ryno Indus. v. Mazda Distribs.*, 807 F.2d 1222, 1225 (5th Cir.), *cert. denied*, 484 U.S. 818, 108 S.Ct. 75, 98 L.Ed.2d 38 (1987) (same). Products that consumers view as

---

2. *See* TBS Opposition Memorandum, Rec.Doc. no. 89, at 7.

3. *Id.* at 8.

4. *Id.* at 8–9.

5. TBS' Statement of Uncontested Facts, Rec.Doc. no. 89, ¶ 7.

6. TBS Opposition Memorandum, *supra*, at 15–16.

7. TBS Statement of Uncontested Facts, *supra*, ¶¶ 6, 13.

8. *Id.* ¶ 17.

9. *Id.*

10. *See* Defendants' Memorandum in Support of Motion for Partial Summary Judgment, Rec.Doc. no. 81, Appendix A, at Exhibit 6 (H. Long Affidavit), Exhibit 12 (K. Boudreaux Affidavit), Exhibit 13 (A. Preston Affidavit) [hereinafter Appendix A]. TBS challenges the independence of one of these experts, Alan Preston (Appendix A, *supra*, Exhibit 13), because his company served as a subcontractor to GIA–LA, although the witness now regards GIA–LA and TBS as competitors.

substitutes for other products can be said to be in competition with each other. *Mazda Distribs.*, 807 F.2d at 1225. The extent to which buyers of one product will switch to another product in response to price changes, or cross-elasticity of demand, determines whether products compete with each other. *H.J., Inc. v. ITT*, 867 F.2d 1531, 1538 (8th Cir.1989) (discussing cross-elasticity of demand). The relevant geographic market, on the other hand, is the area in which buyers can turn for alternative sources of supply. *See, e.g., Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd.*, 924 F.2d 1484, 1490 (9th Cir.1991) (area where buyers look for alternative sources of supply); *A.A. Poultry Farms v. Rose Acre Farms*, 881 F.2d 1396, 1403 (7th Cir.1989), *cert. denied*, 494 U.S. 1019, 110 S.Ct. 1326, 108 L.Ed.2d 501 (1990) (set of sellers buyer can turn to for supplies at existing or slightly higher prices).

In the context presented here, TBS' proffered market definition is artificially constricted because it excludes whole categories of suppliers of reasonably interchangeable products. In short, TBS has demonstrated no basis to limit the relevant market to governmental or quasi-governmental entities utilizing self-funded health plans. While these may be the customers for which plaintiff and defendants compete, plaintiff tendered no evidence that these customers require a specialized product that only the parties can supply. As the Court noted earlier, TBS does not dispute that nongovernmental customers purchased substantially similar services from TBS as did governmental and quasi-governmental health plans.[11] Further, TBS admitted that self-funded plans are but one of a number of options available to the purchaser of health care benefits, and claims administration is a component of most products.[12]

As defendants' experts attested, a governmental or non-governmental employer purchasing health care for its employees can choose from direct indemnity health insurance with claims administration provided by the insurer, or it could fund its own benefits and handle claims administration itself or through a third party administrator.[13] Alternatively, these entities could contract with an HMO, which offers discounted services of selected physicians and hospitals who are paid by the HMO on a per capita or a fee-for-service basis and provide claims administration as part of the package.[14] PPOs are another option, which consist of provider networks supplying discounted services to their customers. Payment to providers is by third-party insurers or by an employer entity, and claims administration can be provided by the PPO, an insurer, a TPA, or in-house personnel.[15] TBS does not dispute these facts.[16]

Although plaintiff claimed that self-funded plans have cost advantages that justify placing them in a market unto themselves, TBS produced no evidence to support such a conclusion. On the contrary, the interchangeability of various health care products is demonstrated by the 1993 request for proposals ("RFP") issued by the School Board. The RFP indicated that the Board's needs could be met by plans combining insured and self-insured features, third party administration, HMOs, PPOs and cafeteria plans.[17] The RFP stated that the Board was "soliciting proposals for all types of plans."[18] In response, the Board received 19 proposals from all over the country to provide insurance, self-funding, third-party administration services, HMOs, or PPOs.[19] In 1994, the School Board sent out a request for proposals to

---

11. TBS Statement of Uncontested Facts, *supra*, ¶ 5; Appendix A, *supra*, Exhibit 4 (TBS Response to Interrogatory No. 46).

12. TBS Statement of Uncontested Facts, *supra*, ¶ 17.

13. *See* Appendix A, *supra*, Exhibit 12 (K. Boudreaux Affidavit), Exhibit 6 (H. Long Affidavit), Exhibit 13 (A. Preston Affidavit).

14. *Id.*

15. *Id.*

16. TBS Statement of Uncontested Facts, *supra*, ¶¶ 18–20.

17. *Id.* ¶ 21.

18. *Id.*

19. *Id.*

approximately 300 suppliers of dental and vision benefits, and it received 17 responses of similar diversity.[20] Plaintiff does not dispute these facts, nor does plaintiff dispute that another quasi-governmental customer solicited proposals from several different types of health care financing suppliers, which it viewed as interchangeable.[21] Further, plaintiff admitted that the City of New Orleans is reevaluating the use of a self-funded health care plan with third-party administration services and is considering direct indemnity health insurance, as well as other types of health care financing as possible alternatives.[22]

When the market is expanded to include the reasonably available substitutes for self-funded health care financing, the number of potential suppliers is substantial. It was undisputed that there are 200 licensed third-party administrators in Louisiana, over 1,000 authorized health insurance providers, 62 PPOs, and 15 licensed HMOs.[23] Further, entry barriers appear to be low, at least as far as third party administration is concerned. Louisiana requires a $500 license fee and a $100,000 fidelity bond to become a licensed TPA.[24] These requirements are not substantial. Further, TBS entered the business in 1989 by buying an established company for $60,000.

There is likewise no credible evidence to support limiting the geographic market to New Orleans. In this case, the only evidence of the geographic locations of suppliers solicited by customers indicated that customers looked to suppliers from all over the country.[25] Indeed, most of the licensed suppliers of third party administration services in Louisiana are from out of state.[26] Further, plaintiff admitted that it has solicited business all over the Gulf South, as well as in Iowa and Virginia.[27]

Since plaintiff has not advanced a credible definition of the relevant market, its arguments about defendants' market share are undermined at their foundation. Moreover, plaintiff has not provided any direct evidence that defendants could raise prices above competitive levels. Nor has plaintiff furnished any evidence that GIA–LA was able to exclude competition. Rather, the evidence suggested that GIA–LA was losing ground to TBS in the New Orleans area. Since GIA–LA's alleged attempts to take over the market, it has lost its two largest contracts.[28] Plaintiff has lost no contracts and gained four additional TPA contracts during this period.[29] In one instance, TBS was even selected over GIA–LA when GIA–LA was the *low* bidder.[30] In face of all of this evidence, TBS suggests that because GIA–LA is minority owned, it receives preferential treatment in the award of certain governmental contracts in New Orleans. Even if this were true, this argument has no antitrust significance in an otherwise competitive marketplace.

The Court takes guidance from decisions of the First Circuit and the Seventh Circuit, which have rejected artificially restrictive market definitions in health care markets. In *United States Healthcare, Inc. v. Healthsource, Inc.*, 986 F.2d 589 (1st Cir.1993), the First Circuit affirmed a magistrate judge's ruling that refused to limit the relevant prod-

**20.** *Id.*

**21.** *Id.* ¶ 22; Appendix A, *supra*, Exhibit 16 (Deposition of F. Moore, at 59–63).

**22.** TBS Statement of Uncontested Facts, *supra*, ¶ 23; Appendix A, *supra*, Exhibit 17 (Deposition of P. Barker).

**23.** TBS Statement of Uncontested Facts, *supra*, ¶ 24; Appendix A, *supra*, Exhibit 18 (L. Dunlap Affidavit).

**24.** Appendix A, *supra*, Exhibit 18 (L. Dunlap Affidavit).

**25.** *See, e.g.*, TBS Statement of Uncontested Facts, *supra*, ¶¶ 21, 26, 27.

**26.** Appendix A, *supra*, Exhibit 18.

**27.** TBS Statement of Uncontested Facts, *supra*, ¶ 8.

**28.** Appendix A, *supra*, Exhibit 3 (Carter Affidavit ¶ 8).

**29.** Appendix A, *supra*, Exhibit 29 (Deposition of M. Lawrence); TBS Opposition Memorandum, *supra*, Exhibits 15, 16, 17 & 19.

**30.** *See* TBS Statement of Uncontested Facts, *supra*, ¶ 30.

uct market to a single type of health care financing product, HMOs. Although plaintiff argued that the cost advantages of HMOs justified setting them apart from other health care financing products, the First Circuit concluded that plaintiff failed to prove that the unique features of HMOs made them a market unto themselves. Rather, the asserted cost advantages of HMOs could be offset in consumers' minds by limitations placed on the choice of doctors under the HMO framework.

Similarly, in *Ball Memorial Hosp., Inc. v. Mutual Hosp. Ins., Inc.,* 784 F.2d 1325 (7th Cir.1986), the Seventh Circuit refused to enjoin Blue Cross and Blue Shield of Indiana from implementing a PPO. The court defined the relevant market as consisting of health care financing and affirmed a ruling that Blue Cross and Blue Shield did not possess sufficient market power to violate the Sherman Act. The court stressed the following features of the health care financing market:

> The Blues, other insurance companies, hospitals offering PPOs, HMOs and self-insuring employers all offer methods of financing health care. Employers and individual prospective patients easily may switch from one financing package to another; nothing binds an employer or patient to one plan.

> . . . . .

> The market in health care financing is competitive. . . . not only because customers can switch readily but also because new suppliers can enter quickly and existing ones can expand their sales quickly. More than 1,000 firms are licensed to sell health insurance in Indiana, and more than 500 sell this insurance currently. . . . "Entry barriers into the market for health care financing are extremely low. All that is needed to compete in Indiana, for example, is sufficient capital to underwrite the policies and a license from the Indiana Insurance Commissioner." Of the 500 firms now selling insurance, many operate nationwide and have (or can attract) plenty

of capital against which to write policies— if the price is right. . . .

*Id.* at 1331–32 (quoting 603 F.Supp. 1077, 1080 (S.D.Ind.1985)).

The court adopted the district court's finding that the defendants did not have the power to restrict output or raise prices in the market because they furnish "a fungible product that other people can and do supply easily." *Id.* at 1331; *see also National Benefit Adm'rs, Inc. v. Blue Cross,* 1989–2 Trade Cas. (CCH) ¶ 68,831 (M.D.Ala.1989) (granting summary judgment because health care financing market was regional, if not national, with 50 to 100 TPAs in Alabama, potential competition from 3,000 TPAs nationwide, and 400 to 600 agents selling health insurance in Alabama). These decisions support the analysis this Court has made here.

■ Plaintiff asserts that it should be relieved of proving the relevant market and defendants' market power under Section 1 of the Sherman Act because it has shown actual adverse effects on competition. Plaintiff relies on *FTC v. Indiana Federation of Dentists,* 476 U.S. 447, 460–61, 106 S.Ct. 2009, 2018–19, 90 L.Ed.2d 445 (1986). TBS claims that evidence of customer complaints, poor service, and dissatisfied providers under contracts with GIA–LA [31] demonstrates anticompetitive effects sufficient to shield it from a full-blown market analysis. The Court concludes that this shortcut is not available to plaintiff here.

■ It is true that market analysis can be avoided by proof of "naked restrictions on price or output." *See, e.g. id.* at 460, 106 S.Ct. at 2019 (citing *NCAA v. Board of Regents,* 468 U.S. 85, 109–10, 104 S.Ct. 2948, 2964–65, 82 L.Ed.2d 70 (1985)). It is also true that proof of an actual detrimental effect on competition, such as a reduction of output, can obviate the need for inquiry into market power. *Id.* Here, plaintiff has proffered no evidence of the nature contemplated by the authority upon which it relies. There is no evidence that defendants reduced the supply of health care financing services or increased the price of those services. If evidence of shoddy products and services, without more,

---

**31.** *See* TBS Opposition Memorandum, *supra,* Exhibits 11, 13.

could serve as a surrogate for proving market power, then the practices of every fly-by-night operator would attract the attention of the antitrust laws. Plaintiff's theory proves too much. The antitrust laws do not function like the Better Business Bureau.

■ Since plaintiff has failed to prove a credible relevant market and defendants' power in that market, its claims under Section 1 of the Sherman Act and for attempted monopolization under Section 2 of the Sherman Act cannot withstand summary judgment. As to plaintiff's claim of conspiracy to monopolize, the Fifth Circuit has not expressly stated that plaintiff must prove the relevant market in a Section 2 conspiracy case. See J.T. Gibbons, Inc. v. Crawford Fitting Co., 704 F.2d 787, 797 (5th Cir.1983) ("It may be that ... in a conspiracy claim under Section 2 plaintiff must prove relevant market."). However, under the rationale of In re Beef Industry, discussed supra, evidence of a fragmented market may provide the basis to grant summary judgment on economically implausible conspiracy theories. Moreover, the Fifth Circuit has rejected Section 2 conspiracy claims when the target of the alleged conspiracy did not constitute a relevant market. See, e.g., Seidenstein v. National Medical Enter., 769 F.2d 1100 (5th Cir.1985) (granting summary judgment on conspiracy to monopolize and attempted monopolization claims because of improper market definition). For these reasons, the defects in plaintiff's proof of a relevant market require dismissal of its Section 2 conspiracy claims.

### C. The Conspiracy Claims—Other Problems.

■ Plaintiff's conspiracy to monopolize claim and its Section 1 conspiracy claim are defective for other reasons. The alleged co-conspirators are GIA–LA, GIA, Carter, former Mayor Sidney Bartholemy ("Bartholemy"), and School Board member, Cheryl Cramer ("Cramer"). Earlier in this case, Judge Marcel Livaudais granted summary judgment dismissing plaintiff's Section 1 and 2 claims to the extent that they were premised on a conspiracy between the commonly owned companies GIA–LA and GIA. The

opinion was based on Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984), which held that a corporation and its 100% owned subsidiary were a single economic unit and hence incapable of conspiring with each other under Section 1 of the Sherman Act. Judge Livaudais, however, determined that Carter, who was president of the two companies, could conspire with them, despite his ownership of the two corporations. He relied on pre-Copperweld case law creating an exception to the rule that a corporation cannot conspire with its own employee; that exception applied when the employee had an independent stake in accomplishing the objectives of the conspiracy. See Domed Stadium Hotel, Inc. v. Holiday Inns, Inc., 732 F.2d 480, 486 n. 5 (5th Cir.1984).

This Court finds, however, that to be consistent with Copperweld, it is Carter's ownership of the two companies or of the holding company that owns the two companies, not his status as an employee, that controls whether he can be a separate economic actor for conspiracy purposes. Copperweld recognized that commonality of ownership means that a "parent and a wholly owned subsidiary always have a 'unity of purpose or a common design.'" Copperweld, 467 U.S. at 771, 104 S.Ct. at 2742. There is no joining of previously separate economic interests when a wholly-owned company and its parent act in concert. This Court perceives no justification for a different rule when the parent is not a fictitious person, but a natural person. Nor does the fact that Carter owns 95% of the holding company which owns 100% of GIA and 95% of GIA–LA require a different result from Copperweld. See, e.g., Bell Atl. Business Sys. Servs. v. Hitachi Data Sys., 849 F.Supp. 702, 706 (N.D.Cal.1994) (80% ownership precludes conspiracy); Orson, Inc. v. Miramax Film Corp., 862 F.Supp. 1378 (E.D.Pa.1994); Leaco Enters. v. General Elec. Co., 737 F.Supp. 605, 608 (D.Or.1990). Thus, plaintiff cannot as a matter of law rely on the concerted action of Carter and his two companies to establish a conspiracy.

■ Plaintiff could, however, claim the necessary plurality of actors for a conspiracy through concerted action by the Carter inter-

ests, Bartholemy and Cramer. However, such a theory fails for both a lack of evidence and the applicability of *Noerr–Pennington* immunity.

Plaintiff only offered two types of evidence in support of the claims that Bartholemy and Cramer conspired with defendants to monopolize the market. First it claims that GIA–LA made numerous campaign contributions in exchange for their support. The list of contributions tendered by TBS shows only a $250.00 contribution to Bartholemy's campaign in 1989.[32] In addition, it shows $2,500.00 in contributions to Cramer's School Board campaign in 1992.[33] Plaintiff then claims that the mayor, Cramer, and politicians controlling the City of New Orleans, the School Board and the RTA preferred GIA–LA because it was minority-owned, despite poor performance. The only evidence in support of this charge was the following. Plaintiff claims that the mayor "unilaterally blamed TBS" for the administrative problems with the city's health plan without speaking to a TBS representative first, although plaintiff admits that the mayor's staff had met with both TBS and GIA–LA on this issue.[34] Plaintiff also cites complaints by defendants to the mayor about TBS's performance and defendants' offer to the mayor to take over the TPA aspect of the city's health plan for "free."[35] Further, plaintiff claims that a statement by the mayor that race was a factor in selecting GIA–LA for the city's PPO contract in the first place was evidence of illegal collusion. Plaintiff also claimed that Cramer urged the School Board to retain the services of GIA–LA after receiving complaints about its performance, because it was the only eligible minority firm.

Plaintiff's evidence is undermined by the undisputed facts that GIA–LA's PPO contract with the city was not renewed when it expired in 1993, and the city thereafter put the whole package out for bids.[36] GIA–LA was not selected when the contract was re-bid. Further, GIA–LA lost the School Board's TPA contract as of September 1, 1994.[37] TBS contends that an antitrust conspiracy arose because "no matter how laudable the goal of minority participation may be, when public officials overlook a company's poor performance and continue to award contracts to those companies which cause damage to the public," then a conspiracy can be shown.[38] The evidence demonstrated that the public bodies in issue did not continue to award contracts to GIA–LA, but took their business elsewhere. Plaintiff's conspiracy evidence is insufficient to withstand summary judgment.

### D. *Noerr–Pennington Immunity.*

At the request of the Court, the parties filed supplemental briefs prior to the hearing on the motions for summary judgment to address the issue of the potential application of the *Noerr–Pennington* doctrine to defendants' efforts to secure and retain the health care contracts of the City of New Orleans and the Orleans Parish School Board. *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961), established that the federal antitrust laws do not regulate the conduct of private individuals in seeking anticompetitive action from the government. *See generally* ABA ANTITRUST SECTION, ANTITRUST DEVELOPMENTS 989 (3d ed. 1992). Rooted in the First Amendment right to petition government, "*Noerr* shields from the Sherman Act a concerted effort to influence public officials regardless of intent or purpose." *United Mine Workers v. Pennington,* 381 U.S. 657, 670, 85 S.Ct. 1585, 1593, 14 L.Ed.2d 626 (1965). If the *Noerr–Pennington* doctrine shields defendants' efforts to influence public officials and bodies, regardless of anticompetitive intent, this conduct cannot be relied on by plaintiff to establish a conspiracy to monopolize under Section

---

**32.** *See id.* Exhibit 9.

**33.** *Id.*

**34.** *Id.* at 6.

**35.** *Id.* at 7.

**36.** *See id.* Exhibit 6 (Deposition of S. Bartholemy, at 38–39).

**37.** *See* Appendix A, *supra,* Exhibit 4 (TBS Response to Interrogatory No. 68).

**38.** *Id.* at 16.

2 of the Sherman Act, or a conspiracy in restraint of trade in violation of Section 1 of the Sherman Act.

Plaintiff contends that the *Noerr–Pennington* doctrine is inapplicable and urges the Court to adopt a "commercial" exception to *Noerr's* application because the governmental entities were acting in a commercial, not a governmental, capacity. Plaintiff relies on *George R. Whitten, Jr., Inc. v. Paddock Pool Builders, Inc.*, 424 F.2d 25, 33 (1st Cir.), *cert. denied*, 400 U.S. 850, 91 S.Ct. 54, 27 L.Ed.2d 88 (1970) (holding that immunity for efforts to influence public officials in the enforcement of laws does not extend to efforts to sell products to public officials acting under competitive bidding statutes). Defendants point out that the Fifth Circuit has at least twice rejected such a commercial exception. *See Independent Taxicab Drivers' Employees v. Greater Houston Transp. Co.*, 760 F.2d 607, 612–13 (5th Cir.), *cert. denied*, 474 U.S. 903, 106 S.Ct. 231, 88 L.Ed.2d 230 (1985); *Greenwood Utils. v. Mississippi Power Co.*, 751 F.2d 1484, 1497 (5th Cir.1985).

The Court is mindful that the United States Supreme Court recently acknowledged a "possible market participant exception" to the corollary, state action doctrine of *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1942). *See City of Columbia v. Omni Outdoor Advertising, Inc.*, 499 U.S. 365, 379, 111 S.Ct. 1344, 1353–54, 113 L.Ed.2d 382 (1991). The *Parker* doctrine is rooted in federalism, and it recognizes the rights of states, as sovereigns, to adopt anticompetitive regulations. The doctrine immunizes the actions of municipalities and other local government entities when their actions stem from clearly articulated and affirmatively expressed state policy authorizing the anticompetitive conduct in issue. *See Town of Hallie v. City of Eau Claire*, 471 U.S. 34, 105 S.Ct. 1713, 85 L.Ed.2d 24 (1985). While the Supreme Court in *City of Columbia* acknowledged the "possibility" of a market participant exception to *Parker*, it did not expressly adopt such an exception or define its parameters. Further, the Court said nothing about the applicability of this "possible" exception to *Noerr–Pennington* immunity. *See City of Columbia*, 499 U.S. at 379–

84, 111 S.Ct. at 1353–56 (discussing *Noerr* immunity).

While the *Noerr–Pennington* doctrine and the *Parker* doctrine are related, they have different origins and applications. *See Greater Houston Transp. Co.*, 760 F.2d at 613 n. 10 ("[T]wo doctrines remain [in large part] mutually independent in origin and in application...."). This Court will not presume that the Supreme Court intended to create an exception to *Noerr* immunity when it did not expressly say so, and the issue was not before the Court. Finding no such exception in Supreme Court authority, this Court is bound by the decisions of the Fifth Circuit in *Greater Houston Transportation Co.* and *Greenwood Utilities* which expressly rejected such an exception. *See Greater Houston Transp. Co.*, 760 F.2d at 612–613; *Greenwood Utils.*, 751 F.2d at 1497.

In *Greenwood Utilities*, the Fifth Circuit dealt with a contract between a government agency and a private party that plaintiff challenged as anticompetitive. The Fifth Circuit stated: "We reject any notion that there should be a commercial exception to *Noerr–Pennington*...." *Greenwood Utils.*, 751 F.2d at 1505. Rather, the court held that the *Noerr* doctrine can apply in the area of government contracts, as well as to restraints adopted by government in the form of laws or regulations. The court expressly recognized that the *Noerr* exception could apply when the petitioned government agency voluntarily becomes a party to an anticompetitive agreement as a participant in the marketplace:

> [T]here may well be cases where a government agency acting as a buyer, seller, or a competitor in the marketplace voluntarily becomes party to agreements that restrain trade without being made the 'victim' of a private defendant. To hold that the antitrust laws do not reach such arrangements is not to stay there is no remedy for the violation, however. The remedy simply lies elsewhere in the form of petitions to government to change its decision.

*Id.* at 1506–07. The Fifth Circuit also reasoned that such a commercial exception would be difficult to apply, particularly when the government makes a "policy decision and

at the same time acts as a participant in the marketplace." *Id.* at 1505. Plaintiff's challenge here is to an asserted preference for GIA–LA because of its minority ownership. Whether and how to take minority participation into account in awarding government contracts involves a policy decision by government actors, even if the government entity is also acting as a participant in the health care market. For the foregoing reasons, the Court finds defendants' efforts to influence the mayor and the School Board to be protected activity under the *Noerr–Pennington* doctrine. As such, this activity cannot be relied on to establish a conspiracy under the antitrust laws.

### E. Defendants' Antitrust Counterclaim.

Defendants also move for dismissal of their antitrust counterclaim against plaintiff under Rule 41 of the Federal Rules of Civil Procedure. There was no opposition to this motion. The motion is granted.

### F. State Law Claims.

This Court's jurisdiction was premised on the federal antitrust law claims that the Court has now dismissed. Defendants have moved to dismiss the remaining state law claims for lack of jurisdiction. Plaintiff's opposition memoranda advanced no argument in favor of this Court's retaining jurisdiction if the antitrust law claims were dismissed.

 The general rule in the Fifth Circuit is to dismiss state law claims when federal claims to which they are appended are dismissed. *See, e.g., Parker & Parsley Petroleum v. Dresser Indus.,* 972 F.2d 580, 585 (5th Cir.1992) (stating general rule). The general rule is supplemented by considerations of "judicial economy, convenience, fairness, and comity." *Carnegie–Mellon Univ. v. Cohill,* 484 U.S. 343, 350, 108 S.Ct. 614, 619, 98 L.Ed.2d 720 (1988). Typically, however, the balance of factors "will point toward declining to exercise jurisdiction over the remaining state-law claims." *Id.* at 350 n. 7, 108 S.Ct. at 619 n. 7. For example, in *Dresser Industries,* the Fifth Circuit found it an abuse of discretion when the district court retained jurisdiction over state law claims once a RICO claim had been dismissed by the district court. In reaching this conclusion, the court noted that dismissal would serve the interests of federalism and that at the time the RICO claim was dismissed, the trial date was still a few weeks away, the district court had not yet spent a significant amount of time familiarizing itself with the merits of the case, and discovery and legal research obtained in preparation for trial were readily transferable to a state court proceeding. *Dresser Indus.,* 972 F.2d at 587–88. In short, the court found that the parties would not suffer undue hardship from dismissal.

 Applying the considerations of judicial economy, convenience, fairness, and comity to the circumstances of this case leads the Court to conclude that the remaining state law claims should be dismissed. The trial date was nearly two weeks away when the Court orally issued its order granting defendants' motions. Any discovery and research already completed in preparation for trial can be used in state court in which a parallel action is already pending. Dismissal will also serve the interests of federalism by assuring that this Court does not unnecessarily decide issues of state law. This Court therefore orders the state law claims dismissed without prejudice.

### III. Conclusion

Based on the foregoing reasoning and analysis, the Court orders plaintiff's claims and defendants' counterclaims under Section 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, dismissed with prejudice. It is further ordered that plaintiff's remaining state law claims be dismissed without prejudice.